# In the
# United States Court of Appeals
## For the Seventh Circuit

———————

No. 06-3815

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

BENJAMIN OCHOA-ZARATE,

*Defendant-Appellant.*

———————

Appeal from the United States District Court
for the Central District of Illinois.
No. 04 CR 40093—**Joe Billy McDade**, *Judge.*

———————

ARGUED OCTOBER 31, 2007—DECIDED SEPTEMBER 2, 2008

———————

Before EASTERBROOK, *Chief Judge*, and BAUER and
WILLIAMS, *Circuit Judges.*

WILLIAMS, *Circuit Judge*. In the fall of 2004, Benjamin
Ochoa-Zarate left California on an ill-fated cross-country
drive with $1 million worth of methamphetamine con-
cealed in a spare tire. A jury believed he knew the drugs
were there and convicted him of conspiring to distribute
the drugs. Ochoa-Zarate maintains that two events
during his trial warrant a new trial. First, during his

rebuttal closing argument, the prosecutor argued that as of the last day of trial, unlike his co-defendant who had pled guilty, Ochoa-Zarate had failed to take responsibility for his actions. We agree that a jury may have taken this comparison as a comment on Ochoa-Zarate's decision to exercise his right to go to trial. Next, Ochoa-Zarate takes issue with the prosecutor's question to the trooper who arrested Ochoa-Zarate that asked whether, based on his training and experience, it was uncommon to find drugs after persons had consented to search. This testimony is of questionable relevance and probably not the subject of lay testimony. Nonetheless, in light of the weight of the evidence of Ochoa-Zarate's guilt, we affirm his convictions.

## I. BACKGROUND

Benjamin Ochoa-Zarate worked for a small bakery in Stockton, California. His cousin, Bryan Castaneda, owned the bakery with Roger Bailey. With the bakery not returning the profits he had hoped, Bailey decided to supplement his income by entering the illegal drug business. He contacted Jose Castaneda, his partner's brother, as Jose had served time in prison on drug charges. Sometime in the fall of 2004, Jose told Bailey he had a deal in the works and asked Bailey if he was interested in driving to New York. Bailey told him that he was.

Around that same time, Ochoa-Zarate drove to Mexico in a car he borrowed from Bryan Castaneda. Ochoa-Zarate returned on October 4, 2004. The next day, he, Jose, and Bailey left the bakery together and made several stops. First, Jose and Ochoa-Zarate deposited $600 into Ochoa-

Zarate's bank account to pay for a rental vehicle. Next, Bailey drove the men to Hertz, and Ochoa-Zarate rented a minivan, listing himself and Bailey as drivers. Bailey had second thoughts later in the day, though, and told Jose he could not go through with the plan.

After obtaining a new cell phone and stopping by the bakery to tell Bryan Castaneda he was going on vacation, Ochoa-Zarate proceeded to drive east alone. By October 7, Ochoa-Zarate had made it to western Illinois, and it was there that Illinois State Trooper Clint Thulen pulled Ochoa-Zarate over for a traffic infraction. Ochoa-Zarate gave the trooper his California driver's license, an I-94 form indicating he had entered the United States from Mexico on October 4, and the rental agreement. The agreement stated that the minivan had been rented on October 5 and was due back in Stockton, California on October 12, 2004.

Ochoa-Zarate's conduct after the stop made Trooper Thulen suspicious. When asked where he was going, Ochoa-Zarate said he was heading to visit his sister in Chicago for about ten days. He was unable, however, to answer where in Chicago she lived. He also did not know his sister's telephone number and claimed that when he arrived in Chicago, he would call his brother in California to get the information. The trooper noticed that a ten-day stay in Chicago would make the rental overdue and that the small duffel bag of clothing in the minivan did not seem adequate for a ten-day stay. He also observed Ochoa-Zarate's hands and body shaking, even though he smiled broadly and acted jovial. Trooper Thulen

returned Ochoa-Zarate's documents and said he was free to leave, and he then asked Ochoa-Zarate whether he was willing to answer more questions. Ochoa-Zarate agreed and signed a written consent authorizing search of the minivan.

With the help of a canine and a density meter, Trooper Thulen found six bags of methamphetamine and coffee grounds hidden inside the minivan's spare tire. The drugs had a street value of about $1 million. After being placed under arrest, Ochoa-Zarate complained of chest pains, and an ambulance took him to the hospital. Doctors determined he was not having a heart attack and discharged him to law enforcement agents. He then waived his *Miranda* rights.

In the later interview, Ochoa-Zarate asked the agents how much prison time he would receive, and he also said he did not know the drugs were in the minivan. He told the agents that when Bailey heard Ochoa-Zarate planned to visit friends in New York, Bailey suggested he save money by renting a vehicle for Bailey, dropping it off in Chicago, and then flying to New York from there. Ochoa-Zarate said he was to call Bailey when he arrived in Chicago and that Bailey or one of Bailey's friends would pick him up and take him to the airport before driving the vehicle back to California.

The agents asked Ochoa-Zarate whom he planned to visit in New York, and Ochoa-Zarate responded that it was someone with the last name of "Barragan" but that he could not recall the person's first name. Later, toward the end of the interview, Ochoa-Zarate told the agents that

he would be meeting "Javier Barragan," describing him as a pastor in New York whom he had met during a retreat in California. When asked for his address, Ochoa-Zarate said he did not know the address but that he had the telephone number somewhere. He further explained that his plan was to fly to New York to surprise Barragan and then to stay there for two weeks to look for a job. He also said that his fingerprints might be on the minivan's spare tire because he had asked Bailey how to change the spare before leaving.

Ochoa-Zarate then told the agents that he wanted to cooperate. He gave them a telephone number that he said belonged to Bailey. When Ochoa-Zarate called the number, however, Jose Castenada—not Bailey—answered. Agents believed that Ochoa-Zarate was alerting Jose Castenada that he had been arrested, as he said that he had been stopped, he asked about Jose's mother's health out of context, and he responded to a question about his well-being by saying "until I can walk tall."

At trial, Bryan Castaneda testified that Ochoa-Zarate did not have a sister that lived in Chicago. Bailey testified that he had never discussed the spare tire with Ochoa-Zarate and that he did not even know where it was located in the minivan. He also said that the two had never discussed the possibility that Ochoa-Zarate would drop off the vehicle in Chicago before flying to New York.

A jury found Ochoa-Zarate guilty of conspiring to distribute methamphetamine in violation of 21 U.S.C. § 846 and possessing methamphetamine with the intent to distribute it in violation of 18 U.S.C. § 841(a)(1). The dis-

trict court sentenced him to 144 months' imprisonment on each count, to run concurrently, and five years of supervised release. He now appeals.

## II. ANALYSIS

### A. Prosecution Closing Argument

Ochoa-Zarate maintains that the district court should have granted a mistrial in light of statements the prosecutor made during his rebuttal closing argument, a decision we review for an abuse of discretion. *See United States v. Aldaco*, 201 F.3d 979, 987 (7th Cir. 2000). A superseding indictment charged Bailey and Ochoa-Zarate with conspiring to distribute methamphetamine and possessing methamphetamine with the intent to distribute it. Bailey subsequently pled guilty and testified at Ochoa-Zarate's trial, acknowledging during his testimony that he had pled guilty and had not yet been sentenced. Ochoa-Zarate, however, exercised his right not to take the stand.

The comments that Ochoa-Zarate challenges came during the government's rebuttal closing argument. In his own closing, Ochoa-Zarate's counsel argued that Bailey's testimony about Ochoa-Zarate's involvement should not be believed, emphasizing that Bailey received a plea offer from the government but had not yet been sentenced. The prosecutor began his rebuttal by responding to the defense's argument that Jose Castaneda had engineered the drug deal by arguing that Ochoa-Zarate had tipped him off several times after Ochoa-Zarate said he would call Bailey. The prosecutor then said:

Let's talk about Roger Bailey for a minute. Roger Bailey got a sweetheart deal, that's what they want you to believe, he got a sweetheart deal. You saw the penalties we had up on the screen. Roger Bailey is looking at five to 40 years in prison. Does that sound like a sweetheart deal to you?

Would he come in here and lie when he is looking at five to 40 anyway? And what happens if he lies? He loses that sweetheart deal of five to 40 years and gets ten to life plus the potential for perjury charge.

You want to judge the credibility of Roger Bailey? Judge the credibility of Roger Bailey. <u>You saw him sitting on the stand. He told you the truth. He told you what he remembers and he told you the truth. And here was the question that was posed to him.</u> "Mr. Bailey, are you a felon?" Answer: "Yes, I am."

And that's the difference between Roger Bailey and this defendant, and I mentioned it in opening statement that this case was about this defendant failing to take responsibility for his own actions. <u>Roger Bailey's at least taken responsibility for his own actions. As of today, this defendant still has not.</u>

(Emphasis added.) At that point, Ochoa-Zarate's counsel objected and said he would like to be heard at sidebar at a later time. The district court overruled the objection, and the prosecutor continued with his rebuttal argument. After its completion, Ochoa-Zarate's counsel asked the district court to declare a mistrial, arguing that the words underlined above invited the jury to draw an adverse

inference from Ochoa-Zarate's decision to exercise his constitutional right to a jury trial. The district court denied the motion, ruling that the argument was not improper because Ochoa-Zarate arguably lied to law enforcement officials after he was stopped. The district court also concluded that even if the argument was improper, it was harmless.

On appeal, Ochoa-Zarate maintains that the prosecutor's comments violated his Fifth Amendment right to refrain from testifying at trial and his Sixth Amendment right to take his case to trial. The Fifth Amendment prohibits the government from "treat[ing] a defendant's exercise of his right to remain silent at trial as substantive evidence of guilt." *United States v. Robinson*, 485 U.S. 25, 34 (1988); *see also Portuondo v. Agard*, 529 U.S. 61, 69 (2000); *United States v. Willis*, 523 F.3d 762, 773 (7th Cir. 2008). The government does not dispute that it also could not use Ochoa-Zarate's exercise of his right to take his case to trial as evidence that he was guilty. *Cf. United States v. Smith*, 934 F.2d 270, 275 (11th Cir. 1991) (finding improper a prosecutor's statement in closing argument that defendant "has not taken responsibility for his actions" because he declined to plead guilty while his co-defendants had done so).

That is not to say that the law prohibits all prosecutorial comments that make reference to a defendant's constitutional rights. When, for example, "the prosecutor's reference to the defendant's opportunity to testify is a fair response to a claim made by defendant or his counsel, . . . there is no violation of the privilege." *Robinson*, 485 U.S.

at 32. To determine whether a prosecutor's remarks are improper, we look to whether, when viewing the remarks in context: (1) it was the prosecutor's "manifest intention" to use the defendant's exercise of his right as evidence of guilt; or (2) "the remark was of such a character that the jury would 'naturally and necessarily' treat it as such." *Willis*, 523 F.3d at 773 (citations omitted).

We agree with the government that there is no evidence here that the prosecutor manifestly intended to use Ochoa-Zarate's decisions to plead not guilty and remain silent during trial as substantive evidence of his guilt. Whether the jury would "naturally and necessarily" treat the prosecutor's remarks this way is a closer call.

Had the prosecutor responded to the attack on Bailey's credibility with only the first three paragraphs of the rebuttal argument that we quoted, the resolution of this issue would be easier. A prosecutor can certainly respond to an attack on a witness's credibility by arguing that the jury should decide whether to believe the witness based on what it observed at trial. *See United States v. Johnson*, 437 F.3d 665, 673-74 (7th Cir. 2006).

Here, however, the argument continued in a manner which suggested that Ochoa-Zarate's exercise of his right to take his case to trial evidenced his guilt. Immediately after pointing out that Bailey had taken the stand and acknowledged he was a felon, the prosecutor compared Bailey to Ochoa-Zarate, saying, "And that's the difference between Roger Bailey and this defendant . . . Roger Bailey's at least taken responsibility for his own actions. As of today this defendant still has not." The government

maintains on appeal that its failure-to-take-responsibility comments referred to Ochoa-Zarate's lies to law enforcement officials the day he was stopped, and perhaps that was the prosecutor's intention. But the statement that Ochoa-Zarate had not taken responsibility "as of to-day"—the last day of trial—does not sound like it was directed at what Ochoa-Zarate said the day of his arrest; indeed, the prosecutor had not been discussing those statements when he made the challenged remarks.

To be sure, the prosecutor's comments did not go as far as some others in cases where courts have found that a prosecutor's comments impermissibly suggested that a defendant's exercise of his right to trial demonstrated his guilt. *See People v. Rodgers*, 756 P.2d 980, 982 (Colo. 1988) ("Juries are very controversial entities. As far as attorneys, some attorneys at least, there is a feeling which I will share with you that if you are innocent—rather, if you are guilty, you would want to request a jury because they just may not convict you and if you are innocent you never want to request a jury because they just might convict you."); *People v. Herrero,* 756 N.E.2d 234, 245 (Ill. App. Ct. 2001) ("[N]ow they wanted a jury trial and you have to ask yourselves why do they want a jury trial . . . . These individuals are gamblers, they live on the edge, they hope that they can get one of you to be suckered in, one of you to believe that they are not guilty . . . ."); *Villarreal v. State,* 860 S.W.2d 647, 649 (Tex. App. 1993) ("This man [ ] made a conscious decision to rape a ten-year-old child. But he didn't do it just once. He forced her to have to come into this courtroom in front of a bunch of strang-

ers."). But the prosecutor's remarks here nonetheless focused on Ochoa-Zarate's "failure to take responsibility" as of the last day of trial, and the prosecutor did not attempt to clear things up after the defense objection. Instead, after the objection, the prosecutor's next statements addressed a different topic—why Ochoa-Zarate would consent to the search of his minivan.[1]

The next question is whether Ochoa-Zarate's conviction can stand in light of the improper comments during rebuttal. Even if a prosecutor's comments implicate a specific trial right, we will uphold the conviction if the government proves beyond a reasonable doubt that the defendant would have been convicted absent the comments. *United States v. Wesley*, 422 F.3d 509, 515 (7th Cir. 2005). Although we apply a different standard to prosecutorial comments that are merely improper but do not violate a specific trial right, *United States v. Cotnam*, 88 F.3d 497-98 (7th Cir. 1996), the government does not dispute that if the comments were improper, the harmless-beyond-a-reasonable-doubt standard applies.

We find that the government has met this burden. The government presented uncontested evidence of numerous lies and inconsistencies that Ochoa-Zarate told to the trooper who stopped his minivan and later to the investi-

---

[1] We also note that although the prosecutor said in the rebuttal, "and I mentioned it in opening argument to you that this case was about this defendant failing to take responsibility for his own actions," the prosecutor hadn't made a similar statement in his opening.

gating agents. Ochoa-Zarate told the trooper he was headed to visit his sister in Chicago for ten days, but he did not have a sister in Chicago. His only sister lived in Sacramento at the time. He also said he did not have his sister's address or telephone number, even though he had at least thirty-seven other telephone numbers with him in the minivan and claimed that he planned to stay with her for ten days.

Perhaps realizing that his story of visiting a sister in Chicago for ten days did not add up, Ochoa-Zarate told a completely different story later in the day when questioned by different agents. During the subsequent interview, Ochoa-Zarate said that he planned to drive the rental vehicle to Chicago, drop it off with Bailey's people there, and then fly to New York. Bailey, however, testified that they had never had any discussions along those lines. In addition, when Ochoa-Zarate offered to cooperate and told agents he would give them Bailey's number, the number Ochoa-Zarate supplied was actually for Jose Castenada, the person who had set up the whole plan.

There was also the physical evidence: Ochoa-Zarate's fingerprints were found on the spare tire. Unprompted, he told an agent that his fingerprints might be on the spare tire because Bailey had demonstrated how to change the tire before he left California. But Bailey said that never happened, and that he had no idea where the spare was in the minivan.

There were other things as well. After the trooper found drugs hidden in the minivan's spare tire, Ochoa-Zarate asked how much time he would receive. He also could

not supply the address, and at first, even the first name, of the friend he said he was visiting in New York. This claim of a plan to travel all the way across the country to surprise a friend whose contact information he did not have with an unannounced two-week stay is certainly questionable.

In addition, Ochoa-Zarate's counsel reminded the jury in his closing argument that the government bore the burden of proving guilt beyond a reasonable doubt and that Ochoa-Zarate was not required to provide any evidence at all. And during the rebuttal, the prosecutor said, "Defense counsel's correct, the government does have the burden[; t]he defendant is presumed innocent." The court's instructions reiterated these points and also told the jury that its obligation was to decide the facts from the evidence, and that the lawyers' comments in opening statements and closing arguments were not evidence. We presume that the jury followed the court's instructions, "absent evidence of an 'overwhelming probability' that it was unable to do so." *United States v. Serfling*, 504 F.3d 672, 677 (7th Cir. 2007) (quoting *United States v. James*, 487 F.3d 518, 524 (7th Cir. 2007)).

An immediate curative instruction from the court would have given us further comfort, and it is true that none was given here. *Cf. id.* ("Prompted by Serfling's timely objection, the district court immediately halted the prosecutor's improper line of questioning and issued a curative instruction to the jury, the substance of which the court repeated during its final jury instructions."); *see also United States v. Young*, 470 U.S. 1, 13-14 (1985) (noting

benefit of immediate curative instructions). Perhaps that's because Ochoa-Zarate did not request one. Considering the prosecutor's brief comments in the context of the record as a whole, we conclude that they do not require a new trial.

### B.   Admission of Trooper's Testimony

Ochoa-Zarate also argues that he should receive a new trial because the district court allowed Trooper Thulen to testify that based on his training and experience, it is not uncommon for a driver of a vehicle to consent to a search of a vehicle where drugs are ultimately found. We review a district court's decision to admit evidence for an abuse of discretion. *United States v. Conn*, 297 F.3d 548, 553 (7th Cir. 2002).

During its redirect examination of Trooper Thulen, the prosecutor asked whether there had ever been a time when a person consented to a search and later admitted knowing drugs were in the vehicle. The defense objected to the question as irrelevant, among other things, and the district court held a lengthy sidebar. During the sidebar, Ochoa-Zarate's counsel further argued that the proposed testimony constituted expert testimony for which he had not received notice and that a question directed to knowledge should not be allowed. The government offered to rephrase the question in a manner that did not specifically ask about a person's knowledge. Ultimately, the court sustained the defense's objection to any questions as to *why* a defendant would consent in such a situation. It ruled, however, that it would allow the prosecutor to

ask a question phrased as: "Based on your experience, is it uncommon for a driver to consent to search of an automobile that ultimately resulted in the presence of drugs?"

Back again before the jury, the prosecutor's examination of Thulen concluded with the following exchange:

> Q. Trooper Thulen, based on your training and experience, is it uncommon for a driver of a vehicle to give consent to search the vehicle where drugs are ultimately found in that vehicle?
>
> A. No, sir, it is not uncommon.

This question was not exactly the question the district court had said it would allow during the sidebar. Instead, in front of the jury, the posed question asked the trooper to testify in part based on his "training." Seizing on this discrepancy, Ochoa-Zarate maintains that the trooper's response to the question before the jury constituted expert testimony for which he had not received proper notice. *See* Fed. R. Crim. P. 16(a)(1)(G) (stating that at defendant's request, government must provide written summary of expert testimony it intends to use, including bases and reasons for those opinions).

Although Ochoa-Zarate's brief focuses principally on whether the testimony was expert (rather than lay) testimony, a threshold question is whether the testimony was relevant. Federal Rule of Evidence 401 defines "relevant evidence" as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable

than it would be without the evidence." One fact of consequence at trial was whether Ochoa-Zarate knew the drugs were in the minivan. But the government agrees that the testimony suggested nothing about Ochoa-Zarate's knowledge of the drugs, so we can eliminate that possible basis. The district court also did not rest on that rationale, instead ultimately allowing the testimony because it wanted the jury to know that the trooper was not doing anything unreasonable when he searched the vehicle even though he had received consent.

On appeal, the government maintains that the testimony "enhanced the trooper's credibility by helping to explain why his actions were reasonable." That argument might hold water if the court was considering whether to grant a motion by Ochoa-Zarate to suppress the evidence on the basis that his consent was involuntary. But Ochoa-Zarate admits (and even emphasizes) that he voluntarily consented to the search, so we do not see how this testimony was relevant on the basis argued by the government here. *Cf. United States v. Gastiaburo*, 16 F.3d 582, 588-89 (4th Cir. 1994) (affirming, without discussing relevancy, admission of officer's testimony that it is not uncommon for person transporting controlled substances to grant consent to law enforcement officers to search their possessions or their persons).

In any event, the primary dispute on appeal is over whether the evidence was expert or lay testimony. Trooper Thulen responded to a question that asked him to testify based on his "training and experience." Federal Rule of Evidence 702 provides:

If scientific, technical, or other specialized knowl-
edge will assist the trier of fact to understand the
evidence or to determine a fact in issue, a witness
qualified as an expert by knowledge, skill, experi-
ence, training, or education, may testify thereto in
the form of an opinion or otherwise, if (1) the
testimony is based upon sufficient facts or data,
(2) the testimony is the product of reliable princi-
ples and methods, and (3) the witness has applied
the principles and methods reliably to the facts of
the case.

When the lay testimony rule (Rule 701) was amended in
2000, the Advisory Committee wrote that the amend-
ment was made "to eliminate the risk that the reliability
requirements set forth in Rule 702 will be evaded through
the simple expedient of proferring an expert in lay wit-
ness clothing." So we are careful to examine whether
"although ostensibly couched as a matter of [the agent's]
direct observation," testimony by a law enforcement agent
is in reality expert testimony. *United States v. Oriedo*, 498
F.3d 593, 603 (7th Cir. 2007).

Here, the government maintains that Trooper Thulen
merely testified to what he saw with his own eyes during
his previous consent searches. Ochoa-Zarate, however,
emphasizes that the question posed to the trooper asked
him to answer based not just on his personal observation,
but also on the basis of his "training." Adding the "train-
ing" qualification tended to make the question sound as
though it asked for a response based on information
broader than merely what the trooper had observed with

his own eyes. *See United States v. Garcia,* 413 F.3d 201, 216 (2d Cir. 2005); *United States v. Lopez-Moreno*, 420 F.3d 420, 439 (5th Cir. 2005) (King, J., concurring); *Conn*, 297 F.3d at 553-55. Although the question the district court told the government it would allow did not include the word "training," Ochoa-Zarate did not object when the prosecutor asked the question before the jury, which could have rectified the situation.

At any rate, we do not find an error requiring reversal here in this case. *See Oriedo*, 498 F.3d at 604 (applying harmless error test to claim that court erroneously admitted expert testimony that was not disclosed to the defense). The testimony here was brief, the district court did not allow the prosecutor to ask whether any search-consenting drivers typically know that their vehicles contain contraband, and, as we have already discussed, the evidence against Ochoa-Zarate was overwhelming. The challenged testimony, in contrast, was no more significant than testimony to which we attributed no reversible error in a factually similar case, *United States v. Navarro*, 90 F.3d 1245 (7th Cir. 1996). There, the prosecutor asked a DEA agent whether it was common, given the number of cases he had handled, to find drugs after someone had given consent to search. *Id.* at 1261. The agent responded that it was common and had happened in his experience many times. The prosecutor then asked the agent to give his *opinion* as to why an individual would consent knowing that drugs were present. The agent answered that Hispanics from outside the United States grant permission more readily than most people because of "the way the police work in other countries." On appeal,

the defendant did not challenge the agent's testimony that he commonly found drugs during consent searches and instead challenged only the agent's opinion, and we characterized even the officer's opinion testimony as "of little significance" and found no reversible error. *Id.* at 1263.

Ochoa-Zarate also had the opportunity to cross-examine the trooper on the basis of his conclusion, even though he chose not to do so. *Cf. United States v. Pree*, 408 F.3d 855, 870-71 (7th Cir. 2005). The government had represented to the court and defense counsel that Trooper Thulen had stopped thousands of people on the highway, had made fifty major drug seizures, and had received consent to search in over half those cases, so Ochoa-Zarate had information to cross-examine the trooper on this point had he chosen to do so. Any error in admitting Trooper Thulen's testimony does not require a new trial. Finally, we note that in light of the weight of the evidence of Ochoa-Zarate's guilt, the combination of the prosecutor's comments in rebuttal and the admission of the challenged testimony do not warrant a new trial.

## III. CONCLUSION

The judgment of the district court is AFFIRMED.

9-2-08