2012 COA 191

**The PEOPLE of the State of Colorado, Plaintiff–Appellee,**

**v.**

**Ruben Rosendo RAMOS, Defendant–Appellant.**

**No. 10CA0035.**

Colorado Court of Appeals, Div. I.

Nov. 8, 2012.

Rehearing Denied Jan. 17, 2013.*

John W. Suthers, Attorney General, Katherine A. Hansen, Senior Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee.

Douglas K. Wilson, Colorado State Public Defender, Adam Mueller, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant.

Opinion by Judge TAUBMAN.

¶ 1 Defendant, Ruben Rosendo Ramos, appeals the judgment of conviction entered on a jury verdict finding him guilty of committing a bias motivated crime and third degree assault. We reverse the judgment of conviction and remand the case to the trial court.

## I. Background

¶ 2 On November 13, 2006, Ramos was riding in the front passenger seat of a car driven by his girlfriend, Mindy Pimperpat. The victim, R.L., was seated immediately behind Ramos in the rear passenger side seat. Pimperpat's three children were seated next to R.L. At trial, R.L. testified that while driving, Pimperpat and Ramos began to argue. Eventually, Ramos turned around in his seat and said to R.L., "I don't know you. I don't like dike bitches like you. I'll beat your ass." Ramos then punched R.L. several times in the face and lower neck. When the assault occurred, Ramos's hand was bandaged and bleeding from an unrelated injury. Blood from his bandaged hand ended up on R.L.'s jacket and baseball cap.

¶ 3 The People charged Ramos with committing a bias-motivated crime in violation of section 18–9–121(2)(a), C.R.S.2012, and assault in the third degree in violation of section 18–3–204, C.R.S.2012. A jury found Ramos guilty on both counts.

## II. Expert Testimony

¶ 4 Ramos asserts that the trial court abused its discretion in allowing a police detective to testify as a lay witness regarding blood spatter and transfer evidence Ramos left on R.L.'s clothing. Specifically, Ramos contends that this testimony improperly bolstered R.L.'s testimony that Ramos had punched her, because the detective's testimony was the only apparently reliable testimony that contradicted Ramos's theory of defense that the blood fell on R.L.'s hat and clothing when he was waving his arm during a verbal argument. We agree.

## A. Standard of Review

¶ 5 We review a court's evidentiary ruling regarding lay testimony for an abuse of discretion. *People v. Chavez*, 190 P.3d 760, 765 (Colo.App.2007). An abuse of discretion occurs where the trial court's ruling is manifestly arbitrary, unreasonable, or unfair. *Id.*

¶ 6 Ramos timely objected to the detective's testimony, contending that the detective should have been qualified as an expert. The trial court overruled the objection, stating that it would "allow some brief inquiry in this area." Accordingly, Ramos made a proper objection in the trial court. Thus, we apply the harmless error standard for reversal. *See People v. Veren*, 140 P.3d 131, 139–40 (Colo.App.2005). Under this standard, we may not reverse a conviction if we "can say with fair assurance that, in light of the entire record of the trial, the error did not substantially influence the verdict or impair the fairness of the trial." *Id.* at 140.

## B. Relevant Facts

¶ 7 Ramos challenges the testimony of a detective. On direct examination, the detective stated that he had worked on thousands of cases that "involved some degree of blood" during his nineteen years as a police officer. The prosecutor then asked the detective, based on his "training and experience," whether there was a difference "between blood that comes from transfer and blood that is cast off," and what that difference

might look like. The detective explained the visual difference between the two types of stains, and provided examples of how they could occur. The prosecutor then asked the detective, "[I]s there a technical term used for [blood] droplets?" to which the detective replied, "[S]patter." The detective then examined photographs of R.L.'s hat and clothes and concluded that the blood on the clothes was "spatter," while the blood on the hat was "transfer" caused by contact with a bloody object. During a relatively brief direct examination, the prosecutor asked the detective four times to respond to his questions based on the detective's "training and experience."

¶ 8 On cross-examination, the detective stated that he had not conducted any blood spatter analysis in relation to the actual investigation of the case and had not examined the physical evidence. Instead, the detective explained that he had been asked by the prosecution to testify regarding the differences between blood spatter and blood transfer. He then stated that based on his examination of the photographs, the transfer stain on the hat was slightly smaller than a dollar bill. On redirect examination, the detective stated that the stain on the hat was about the size of a fist.

### C. Analysis

¶ 9 Whether the trial court abused its discretion turns on whether the admission of the officer's testimony was proper under CRE 701, because the prosecution did not seek to qualify the officer as an expert under CRE 702. *Veren,* 140 P.3d at 136.

¶ 10 In *People v. Stewart,* 55 P.3d 107 (Colo.2002), the supreme court held that police officer testimony may fall under either CRE 701 or CRE 702, but noted the difficulty in making such a classification. *Id.* at 123. The court recognized that "police officers regularly, and appropriately, offer testimony under [CRE] 701 based on their perceptions and experiences." *Id.* The court held, however, that "when an officer's opinions require the application of, or reliance on, specialized skills or training, the officer must be qualified as an expert before offering such testimony." *Id.*

¶ 11 Following *Stewart,* the supreme court amended CRE 701 to provide:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

*Cf.* CRE 702 (expert testimony is based on scientific, technical, or other specialized knowledge).

¶ 12 Accordingly, when determining whether testimony is permissible under CRE 701, "the critical inquiry is whether a witness's testimony is based upon 'specialized knowledge.' '[A] person may testify as a lay witness only if his opinions or inferences do not require any specialized knowledge and could be reached by any ordinary person.'" *Veren,* 140 P.3d at 137 (quoting *LifeWise Master Funding v. Telebank,* 374 F.3d 917, 929 (10th Cir.2004)).

¶ 13 To determine whether an opinion is based on specialized knowledge, we look to whether ordinary citizens can be expected to have known the information or have had the experiences that form the basis of the opinion. *People v. Rincon,* 140 P.3d 976, 983 (Colo.App.2005). Thus, "courts should also consider whether the opinion results from 'a process of reasoning familiar in everyday life,' or 'a process of reasoning which can be mastered only by specialists in the field.'" *Veren,* 140 P.3d at 137 (quoting *Rincon,* 140 P.3d at 983).

¶ 14 Therefore, a police officer may only offer opinion testimony under CRE 701 when the basis of that opinion arises from experiences or information common to the average lay person. *Id.* However, where the officer's opinion is based in "experience-based specialized knowledge"—experience unique to the witness's role as a police officer that could be likened to training or education—the officer must be qualified an expert under CRE 702. *See Brooks v. People,* 975 P.2d 1105, 1115 (Colo.1999) (experience

gained while working with police dogs constituted specialized knowledge under CRE 702).

¶ 15 Other jurisdictions have additionally looked to the nature of the question being asked of the officer to determine whether his or her response is lay testimony or expert testimony. In *State v. McLean*, 205 N.J. 438, 16 A.3d 332 (2011), the New Jersey Supreme Court held that a detective's testimony should have been introduced as expert testimony "because it was elicited by a question that referred to the officer's training, education and experience." *Id.* at 347. Similarly, in *United States v. Ochoa–Zarate*, 540 F.3d 613 (7th Cir.2008), a prosecutor asked a police officer "whether, based on his training and experience, it was uncommon to find drugs after persons had consented to [a] search." *Id.* at 614. In analyzing the admissibility of the testimony, the court concluded that by adding the "training and experience" qualifier to the question, the prosecutor created an appearance that any answer was based on information broader than everyday observations and experiences. *Id.* at 622.

¶ 16 Colorado courts have not addressed whether testimony regarding blood spatter and transfer is permissible under CRE 701. However, a division of this court has held that admitting expert testimony regarding blood spatter and crime scene reconstruction is not an abuse of discretion because it enables a witness "to point out things that a lay person would not normally observe and draw conclusions that a lay person would not normally reach." *People v. Miller*, 981 P.2d 654, 659 (Colo.App.1998).

¶ 17 Additionally, numerous other jurisdictions have admitted expert testimony regarding blood spatter and transfer. *See, e.g., State v. Goode*, 341 N.C. 513, 461 S.E.2d 631, 641–42 (1995) (expert testimony admissible where officer testified that a lack of blood spatter on a suspect in a stabbing case was insufficient evidence to exculpate the suspect); *State v. Halake*, 102 S.W.3d 661, 670–71 (Tenn.Crim.App.2001) (expert testimony admissible where officer compared blood spatter on defendant's pants to blood spatter the officer observed from other gunshot wounds in the past).

¶ 18 Here, the detective's testimony had the hallmarks of expert testimony, but the detective had not been qualified as an expert. We reach this conclusion for four reasons: (1) the detective testified about his extensive experience investigating cases involving blood; (2) the detective used the technical terms "spatter" and "transfer" and defined them for the jury; (3) the prosecutor advised the court that the detective was testifying "as to his training and experience," and used that phrase four times in questioning the detective; and (4) the detective testified, as experts often do, not based on his personal knowledge or investigation of this case.

¶ 19 First, the detective testified regarding his extensive experience investigating "thousands" of cases involving blood, and applied that experience to the evidence in the case. Thus, his testimony included observations and conclusions based on experiences not common to a lay person. *See Veren*, 140 P.3d at 137 ("In assessing whether an opinion could be reached by any ordinary person, courts consider whether ordinary citizens can be expected to know certain information or to have had certain experiences.").

¶ 20 Second, in response to the prosecutor's questions, the detective defined the "technical term[s]" spatter and transfer. The act of defining or providing a technical term is necessarily "based on scientific, technical, or other specialized knowledge," and is therefore inadmissible as lay testimony. CRE 701(c). Accordingly, the testimony should have been admitted as expert testimony under CRE 702, because the content of the questions and answers was based on specialized knowledge, rather than information commonly known to the lay jurors. *See* CRE 702; *Veren*, 140 P.3d at 137.

¶ 21 Third, the prosecutor's questioning of the detective emphasized to the jury that the detective's answers were based on specialized knowledge. By repeatedly asking the detective to answer based on his "training and experience," the prosecutor impermissibly conferred an aura of expertise on the detective, similar to the prosecutors' conduct in *Ochoa–Zarate* and *McLean. Ochoa–Zarate*, 540 F.3d at 622 ("Adding the 'training' qualification tended to make the question sound

as though it asked for a response based on information broader than merely what the trooper had observed with his own eyes."); *McLean*, 205 N.J. 438, 16 A.3d at 346; *see also United States v. Garcia*, 413 F.3d 201, 215 (2d Cir.2005) (Rule 701 was designed to prevent parties from cloaking lay witnesses with an "aura of expertise") (citing Fed. R.Evid. 701 Advisory Committee Notes on 2000 Amendments).

¶ 22 Finally, the detective testified based on his interpretation of photographic evidence presented at trial, rather than his own firsthand observations of evidence. This type of testimony differs from that of a lay "fact witness" and instead reflects the type of interpretation normally conducted by an expert. This is because expert witnesses may present opinions regarding "facts presented at trial (either by means of a hypothetical question or through other evidence received at the hearing)." *People v. Valencia*, 257 P.3d 1203, 1205 (Colo.App.2011). In contrast, "the role of a fact witness is to relate, based on personal knowledge, information or events relevant to an issue at trial." *People v. Munoz–Casteneda*, 2012 COA 109, ¶ 11, 300 P.3d 944.

¶ 23 We reject the People's argument that the bloodstain analysis conducted by the officer in this case was lay testimony because it was not as complex as that conducted in the other instances in which expert witnesses have testified regarding bloodstains. The People have not provided authority to support this contention, nor have we found any.

### 1. Opening the Door

¶ 24 The People argue that even if the detective's testimony should have been presented pursuant to CRE 702, it was still admissible because Ramos, prior to the detective's testimony, "opened the door" by cross-examining witnesses about the location of blood on R.L.'s clothing, and used the terms "spatter" and "transferred." We disagree.[1]

¶ 25 The doctrine of "opening the door" allows a trial court to admit otherwise inadmissible evidence when such evidence is necessary to prevent the other party from gaining an unfair advantage through the presentation of "evidence that, without being placed in context, creates an incorrect or misleading impression." *People v. Melillo*, 25 P.3d 769, 775 (Colo.2001). Where one party opens the door to otherwise inadmissible testimony, the opposing party may then inquire into the otherwise barred matter. *Golob v. People*, 180 P.3d 1006, 1012 (Colo. 2008).

¶ 26 In *Golob*, the supreme court considered whether a defense witness, who may have lacked sufficient expert qualifications, could still give expert testimony under the "opening the door" doctrine. *Id.* at 1012–13. The court held that such testimony was permissible because the prosecution had introduced a witness who commented on the validity of a report prepared by the defense witness. *Id.* The court reasoned that, "[b]y limiting [the defense witness's] testimony, the trial court permitted the jury to hear only one side of this issue." *Id.*

¶ 27 Conversely, in *People v. Murphy*, 919 P.2d 191, 192–93 (Colo.1996), the defendant sought to introduce evidence of prior homosexual acts of a rape victim. The defendant argued that the prosecution opened the door to such evidence when, during opening statements, the prosecutor said that the victim was married and had a child, and on direct examination the victim made statements that "indicated that [he] objected to [the defendant's] sadistic sexual assault." *Id.* at 197. However, the court held that the statements made and elicited by the prosecutor did not require the introduction of the evidence of prior sexual acts in order to ensure the fairness of the trial. *Id.* at 196.

¶ 28 Here, the relationship between the statements elicited by Ramos and the testimony of the detective is akin to that in *Murphy*. While cross-examining R.L., Ramos's counsel asked R.L. whether the drops

1. The People additionally argue that, even if the testimony of the detective was improper, it was admissible as rebuttal testimony. However, for the same reasons discussed in this section, spe-

cifically that the testimony of the detective was not required to directly explain or refute the testimony presented by Ramos, we disagree.

of blood on her jacket came from Ramos's punching her, to which R.L. replied, "No." Ramos's counsel then asked, "Those came from like splatter, essentially, from where his hand was bleeding?" to which R.L. replied, "Correct." Similarly, while cross-examining the officer who first spoke with R.L., Ramos's counsel asked, "Now when you spoke to [R.L.], she had what appeared to be blood spatter on her hat and her jacket, correct?" to which the officer replied, "What she said was blood spatter." Ramos's counsel then asked whether the blood on the jacket and hat "was somehow transferred ... during the course of [Ramos's]· supposedly assaulting her," to which the officer replied, "Yes."

¶ 29 These statements cannot be said to have opened the door for later testimony regarding the scientific difference between blood spatter and blood transfer and analysis based on that difference.

¶ 30 The first question above used the word "splatter," which is not a technical term. The second question asked whether there was spatter on R.L.'s hat and jacket, without distinguishing the type of blood on each item. Finally, the third question used the colloquial term "transferred," not "transfer" as a technical term.

¶ 31 At no point did Ramos inquire of the witnesses whether the bloodstain pattern on the hat indicated that there was contact between Ramos's fist and R.L.'s head. In fact, Ramos's counsel never distinguished the stains on the hat from those on the jacket, and never inquired which stains were caused by transfer versus spatter. Instead, the testimony merely demonstrated that Ramos's blood was found on R.L.'s clothing and hat, and that some of that blood was not the result of Ramos's hitting her. Accordingly, we cannot conclude that the detective's testimony was necessary to prevent the defendant from gaining an unfair advantage. *See Melillo*, 25 P.3d at 775. Nor can we say that barring the testimony would have caused the jury to hear "only one side of the issue." *See Golob*, 180 P.3d at 1012. Therefore, the detective's testimony was not admissible under the "opening the door" doctrine.

## 2. Harmless Error

¶ 32 Having determined that the trial court abused its discretion in allowing the detective to testify as a lay witness, we consider whether the error was harmless.

¶ 33 In determining whether an error is harmless, "the appropriate question is whether the error substantially influenced the verdict or affected the fairness of the trial proceedings." *People v. Quintana*, 665 P.2d 605, 612 (Colo.1983); *see also People v. Casias*, 2012 COA 117, ¶¶ 61–65, 312 P.3d 208. An error will only require reversal where it is shown that but for the error, there was a reasonable probability the outcome would have been different. *Krutsinger v. People*, 219 P.3d 1054, 1063 (Colo.2009). The supreme court has clarified that reasonable probability "intend[s] something less than a preponderance of the evidence." *Id.*

¶ 34 Here, we cannot say that the error was harmless. The detective's testimony was essential in proving that Ramos punched R.L., and but for his testimony there was not overwhelming evidence of guilt presented at trial. During the trial, R.L. testified that Ramos punched her, but portions of her testimony were inconsistent with previous statements she had made to police and the district attorney. Additionally, none of the other passengers in the car testified. Therefore, the detective's testimony was the only apparently reliable testimony establishing that Ramos actually punched R.L. The detective's testimony was also the only apparently reliable testimony that contradicted Ramos's defense that his blood fell onto R.L.'s hat and clothing when he was waving his injured fist through the air during a verbal argument. Accordingly, without the detective's testimony, a reasonable probability exists that the outcome would have been different.

¶ 35 Finally, we note that by introducing the detective's testimony as lay testimony, the prosecutor potentially prevented Ramos from presenting his own expert on blood spatter to rebut the detective's testimony. In *Veren*, a division of this court concluded that

[w]hen the prosecution proffered expert testimony by police officers without pretrial disclosure or qualifying them as expert witnesses, the defense may have been prejudiced. Because defendant did not have the benefit of pretrial disclosure of the officers' expert testimony and the bases of their opinions, he did not have the opportunity to evaluate the testimony in advance of trial or to obtain his own expert witness.

140 P.3d at 140 (citation omitted).

¶ 36 Accordingly, we conclude that the trial court abused its discretion by allowing the detective to testify as a lay witness regarding blood spatter and blood transfer. Therefore we reverse and remand for a new trial.

In the interest of judicial economy, we address Ramos's remaining contentions which are likely to recur on remand.

## III. The Court's Comments

¶ 37 Ramos contends that the court's comments during voir dire violated his constitutional right to a fair trial by lessening the prosecution's burden of proof, refuting the presumption of innocence, and aligning itself with the prosecution. *See* U.S. Const. amends. V, VI, XIV; Colo. Const. art. II, §§ 16, 23, 25. We conclude that the trial court's comments were improper, but need not determine whether they constituted reversible error.

### A. Relevant Facts

¶ 38 Ramos challenges three portions of the trial court's voir dire of the jury. First, Ramos challenges comments made by the trial court that Ramos "did something." He also challenges the trial court's voir dire where the court referred to the prosecution and itself as "we."

¶ 39 Second, Ramos challenges a portion of the trial court's explanation of the burden of proof, because it aligned the judge with the prosecution. Specifically, the judge used an example in which he witnesses one of the jurors steal an iPod from a department store and he then asks a detective to bring charges against the juror. The court emphasized that if the charges were brought, the government would still have to prove guilt, rather than the juror having to prove innocence.

¶ 40 Third, Ramos challenges the trial court's statements about how jurors need to set aside their expectations created by watching fictional crime television shows, and instead consider only the evidence presented in the case. The court gave an example in which a fictional television police officer sees a spot of blood at a crime scene, collects the blood with a Q-tip, sends the Q-tip to a crime lab, and promptly receives DNA results identifying a suspect. The court then stated:

[It doesn't] happen that way. Okay. It will never happen—well, I don't want to say it will never happen that way, but it's going to be a long time. Okay? And I'm concerned that people will, you know, after watching the show and other shows like it will think, you know, well, why can't they do that? They do it on TV. It just doesn't happen that way.

... [C]an you assure me that if you sit on this jury that you will put aside those kinds of experiences or what you see on TV and deal just with what is real in this courtroom and, that is, the evidence that's presented here? ... And not allow yourself to be, you know, carried over? And, in fact, I'm going to ask you to do one other thing, Ms. D[ ]. If you do sit on this jury and you are in the jury room deliberating and somebody else says, well, you know, I heard where they can do this or I read this in the paper. Can you be the one to stand up and say, wait a minute? We have to deal with the evidence in this case and not what the newspaper says or not what they show on TV, so let's get back to reality and let's deal with this case.

### B. Standard of Review

¶ 41 Ramos contends the trial court's comments constituted structural error requiring reversal. In *People v. Estes*, 2012 COA 41, 296 P.3d 189, the majority of a division of this court concluded that nearly identical comments during voir dire, made by same trial court judge, were improper, but did not constitute reversible error. *Id.* at ¶ 12. However, because we reverse Ramos's con-

viction on other grounds, we decline to consider whether structural error applies.

### C. Analysis

¶ 42 The *Estes* division concluded that the trial "court should have avoided any suggestion that defendant 'did something,'" and that "[a]lthough it explained that defendant may have done nothing illegal, its prior statements were confusing and could have suggested to prospective jurors that the court believed the suspicion against defendant, and thus, the charges leveled by the prosecution were warranted." *Id.* at ¶ 10. The division further concluded that the "confusion was compounded by the court's use of 'we,' which improperly aligned the court with the prosecution, implying that it found the evidence against defendant sufficient to justify his standing trial." *Id.* Considering these conclusions, we are confident that such comments will not recur on remand.

¶ 43 Ramos additionally challenges the comments made by the trial court regarding fictional crime television shows, and its comments regarding the burden of proof. He contends that the court made the prosecution's evidence appear to be "too good to be true," because in his case a Q-tip was used to collect a blood drop which identified him as a suspect. He further contends that the court's comment suggesting that the judge could request the detective to bring charges against people aligned the court with the prosecution.

¶ 44 We decline to consider whether these comments prejudiced Ramos, either on their own or in combination with the court's other comments, because we reverse his conviction on other grounds. However, we note that such comments posed a risk of confusing or misleading the jury. *See id.* Accordingly, similar comments should be avoided on remand.

### IV. DNA Sample

¶ 45 Ramos contends the trial court erred in compelling him to provide a DNA sample because the People did not provide an affidavit setting forth the grounds to support an order to collect evidence pursuant to Crim. P. 41.1(c). We disagree.

### A. Standard of Review

¶ 46 We review de novo questions of interpretation and application of the rules of criminal procedure. *People v. Angel*, 2012 CO 34, ¶ 13, 277 P.3d 231.

### B. Relevant Facts

¶ 47 On May 4, 2009, after charges had been brought against Ramos, the prosecutor filed a motion for nontestimonial identification evidence under Crim. P. 16 and 41.1. The motion alleged that probable cause existed to believe Ramos committed the crimes charged, and that DNA evidence would be of material aid in establishing Ramos committed the offenses charged. The trial court granted the motion following a short hearing.

### C. Analysis

¶ 48 Ramos argues that the prosecutor failed to comply with the provisions of Crim. P. 41.1 when making his request for DNA evidence. He asserts that the prosecution failed to provide an affidavit as required by the rule, and that the court's findings were therefore inadequate and a violation of his Fourth Amendment rights. He bases his argument on the language in Crim. P. 41.1. Crim. P. 41.1 requires the prosecutor to file one or more affidavits with the court setting forth the following grounds in support of an order for nontestimonial identification evidence: (1) that probable cause exists to believe that an offense has been committed; (2) that there are reasonable grounds to suspect that the person named in the affidavit committed the offense; and (3) that the results of the specific nontestimonial identification evidence requested will be of material aid in determining whether the person named in the affidavit committed the offense.

¶ 49 However, the supreme court, as well as a division of this court, has held that Rule 41.1 only applies to requests for nontestimonial identification evidence made before the police have probable cause to make an arrest. *People v. Diaz*, 53 P.3d 1171, 1177 n. 6 (Colo.2002) ("We note that once judicial proceedings against a defendant have been initiated, the prosecution in seeking nontesti-

monial identification evidence must proceed with notice through Crim. P. 16(II)(a)....."); *People v. Angel,* 701 P.2d 149, 150–51 (Colo. App.1985) (same). We are bound by the supreme court's decision. Accordingly, Crim. P. 16(II)(a)(1) governs. *Diaz,* 53 P.3d at 1177 n. 6.

¶ 50 Crim. P. 16(II)(a)(1) provides: "Notwithstanding the initiation of judicial proceedings, and subject to constitutional limitations, upon request of the prosecuting attorney, the court may require the accused to give any nontestimonial identification as provided in Rule 41.1(h)(2)." The plain language of this rule does not require an affidavit or showing of special circumstances before the trial court may order a defendant to provide nontestimonial evidence. *Angel,* 701 P.2d at 150.

¶ 51 Ramos contends that *Angel* is distinguishable because, here, he was not afforded a preliminary hearing, and therefore, the trial court did not make a probable cause determination prior to issuing the order. However, no language in *Angel* or Crim. P. 16 suggests that the rule only applies if a defendant was afforded a preliminary hearing. Accordingly, we decline to depart from the persuasive holding in *Angel.*

¶ 52 Therefore, we conclude the court did not err in authorizing the nontestimonial identification evidence without requiring the prosecutor to file an affidavit.

¶ 53 We decline to consider Ramos's restitution argument on appeal, because it is unlikely to recur on retrial.

¶ 54 Accordingly, the judgment of conviction is reversed, and the case is remanded to the trial court for a new trial.

Judge LOEB concurs.

Judge WEBB dissents.

Judge WEBB dissenting.

¶ 55 The detective's characterization of some blood spots shown in photographs of clothing worn by the victim as "cast off" or "spatter," and another stain as "transfer," constituted proper lay opinion testimony because it was based on his direct observations of the photographs, which were in evidence, coupled with reasonable inferences drawn from the photographs, which could be drawn without specialized training. Thus, I respectfully dissent from Part II. C of the opinion. Because I agree with the rejection of other arguments for reversal, as explained in Parts III and IV of the opinion, I would affirm the judgment of conviction.

### I. Facts

¶ 56 The detective's direct examination covers less than nine pages of transcript. He testified to having participated in "thousands" of cases that "involved some degree of blood." Although he responded to some questions based his "training and experience," he was not asked on direct about, nor did he offer any description of, either that training or its effect on his opinions. On cross-examination, he acknowledged that he had not done any "blood spatter analysis."

¶ 57 The detective's direct testimony was based on photographs of the victim's clothing. The record includes three photographs that depict very small spots at different places on the victim's jacket and two photographs that depict a much larger splotch on the victim's hat. The detective compared one photograph of the jacket to one photograph of the hat.

¶ 58 The detective acknowledged a difference "between blood that comes from a transfer rather than blood that is cast off," explaining:

> It could be anything. For example, if I had a cut on my hand and I touched the table, then there would be blood still here on the table. That would be a transfer. If my hand was bleeding and I talked with my hands and then the blood starts to go to places, you'll find droplets laying around.

After viewing the photographs, the detective testified that the blood on the hat looked like a transfer, meaning, "something that has blood on it and is touching ... the hat, and leaving what appears to be blood from one item and leaving that blood on the hat." The detective described the blood on the jacket as "a spatter or cast off droplet type of blood." He continued:

It could be from anything. Like I said, a hand waiving and spraying the blood. It could be something bloody with a sudden stop. The blood will, of course, continue and land somewhere.

## II. Scope of Review

¶ 59 Review of an evidentiary ruling for an abuse of discretion, *People v. Stewart*, 55 P.3d 107, 122 (Colo.2002), is constrained by the following principles:

> In assessing whether a trial court's decision is manifestly unreasonable, arbitrary, or unfair, we ask not whether we would have reached a different result but, rather, whether the trial court's decision fell within a range of reasonable options. Accordingly, we do not look to see whether we agree with the trial court. Instead, we review the trial court's decision to ensure that it was based on credible evidence and that it did not exceed[ ] the bounds of the rationally available choices.

*Churchill v. Univ. of Colorado at Boulder*, 2012 CO 54, ¶ 74, 285 P.3d 986 (internal citations omitted).

## III. Law

¶ 60 Under CRE 701, lay opinion is not based on "specialized knowledge," and, instead, "could be reached by any ordinary person." *People v. Veren*, 140 P.3d 131, 137 (Colo.App.2005). Courts consider whether "the opinion results from 'a process of reasoning familiar in everyday life,' or 'a process of reasoning which can be mastered only by specialists in the field.' " *People v. Rincon*, 140 P.3d 976, 983 (Colo.App.2005). Although such distinctions have "generated equal measures of confusion and controversy," police officers commonly offer lay opinions under CRE 701 "based on their perceptions and experiences." *Stewart*, 55 P.3d at 123. An officer must be qualified as an expert only "when an officer's opinions require the application of, or reliance on, specialized skills or training." *Id.*

¶ 61 However, merely possessing specialized training does not require the witness to testify as an expert if the witness could have offered the same testimony without specialized training. *See People v. Mollaun*, 194 P.3d 411, 419–20 (Colo.App.2008); *People v. Souva*, 141 P.3d 845, 850 (Colo.App.2005); *cf. People v. Miller*, 981 P.2d 654, 659–60 (Colo.App.1998) (witness with experience in blood-stain splatter interpretation may be admitted as an expert because his experience "enabled him to point out things that a lay person would not normally observe *and draw conclusions that a lay person would not normally reach* ") (emphasis added).

¶ 62 For example, in *People v. Tallwhiteman*, 124 P.3d 827 (Colo.App.2005), two police officers, testifying as lay witnesses, were asked multiple questions about the defendant's statements at the time of his arrest. *Id.* at 831–32. Then, based on their "experience as a police officer," they were asked to opine whether such statements were common among criminal suspects. *Id.* Also, the officers gave opinions on the defendant's state of mind at the time of arrest based on his behavior. *Id.* at 832. This principle—that the basis of testimony determines whether it is lay testimony rather than the specific language used—distinguishes Colorado law from the reasoning the majority cites in *United States v. Ochoa–Zarate*, 540 F.3d 613, 622 (7th Cir.2008) (stating that the use of "training" in the question to the witness "tended to make the question sound as though it asked for a response based on information broader than merely what the trooper had observed with his own eyes").

¶ 63 The *Tallwhiteman* division determined that admitting the lay opinion was not error, as:

> [T]he officers stated their opinions of defendant's conduct based on their observations of him and their everyday experiences and then drew a rational conclusion about defendant's state of mind. There is no indication that their opinions were based on any specialized training or education.

*Id.* (citation omitted). Rather, "[i]t is only where an officer's testimony is based not only on his or her perceptions, *but also on specialized training or education*, that the officer must be properly qualified as an expert witness." *Id.* (emphasis added).

¶ 64 *People v. Caldwell,* 43 P.3d 663 (Colo. App.2001), reached a similar conclusion. In *Caldwell,* a former police officer trained as a crime scene technician testified as a lay witness that he photographed the crime scene in question, including multiple bullet holes. *Id.* at 667. Then, based on the bullet holes and some string, he traced what he believed to have been the trajectory of the bullets and shared this opinion with the jury. *Id.* In concluding that these statements were lay testimony, the division said that even while ballistic evidence is usually admitted as expert testimony:

> [T]he witness' testimony included only his observations about the entry locations of the bullets and the path they traveled inside the vehicle. Such observations could just as easily have been made by the jury from the photographs. No special expertise is required to look at the hole made by the bullet and realize that it followed a straight-line path.

*Id.*

¶ 65 Thus, to require admission as expert testimony under CRE 702, a witness must *use* his specialized training to *interpret* facts. The witness who merely draws conclusions from everyday reasoning processes is not testifying as an expert. *Compare Stewart,* 55 P.3d at 124 (holding that an officer offered expert testimony when he used skidmarks at the scene to reconstruct an accident and deduce a vehicle's speed, position, and direction), *with Rincon,* 140 P.3d at 983 (holding that an officer testifying about witness uncertainty in picking suspects out of photo arrays was not expert testimony because *"although the officer had experience with photo arrays that an ordinary citizen would not have had,"* the opinion the officer expressed was one which could be reached by any ordinary person ... [and] the *result of a process of reasoning* (namely, use of common sense and logic) familiar in everyday life") (emphasis added).

¶ 66 *Veren* does not diminish this principle. Despite not having been offered and accepted as experts, the police officers in *Veren* testified that the amount of pseudoephedrine in the defendant's possession was beyond the limit legally sold at any one location, sending up "a red flag of somebody that's possibly manufacturing" methamphetamine. 140 P.3d at 138. The officers also found Heet and starting fluid along with the pseudoephedrine, which in the officers' opinion increased the likelihood that the defendant was manufacturing methamphetamine. *Id.*

¶ 67 The division "recognize[d] that certain basic information about drugs may properly fall within the scope of lay opinion testimony. Indeed, [a statute] specifically lists pseudoephedrine as a potential precursor to methamphetamine manufacture." *Id.* at 139 (internal citations omitted). However, the witnesses' opinions required interpreting:

> [W]hether a particular quantity of an illegal substance is so large that it would likely be used for future sale. By definition, the only persons having such knowledge would be those who are either actually involved in the sale of illegal substances, or those who are involved in law enforcement's efforts to curb such sales. Either way, this knowledge must be regarded as specialized.

*Id.* (quoting *State v. Rothlisberger,* 2004 UT App 226, n. 5, 95 P.3d 1193, 1200 n. 5, *aff'd,* 2006 UT 49, 147 P.3d 1176). As the testimony necessarily relied on technical conclusions based on specific quantities and combinations of chemicals that were beyond "the common knowledge of ordinary citizens," the witnesses were not offering lay testimony. *Id.*[2]

**2.** *State v. Goode,* 341 N.C. 513, 461 S.E.2d 631 (1995), cited by the majority, does not suggests a different rule. *Goode* holds that blood spatter analysis has a sufficiently scientific foundation to be the subject of expert testimony under a *Daubert*-type analysis. However, *Goode* does not stand for the proposition that *all* witnesses who testify about blood spatters necessarily are offering expert testimony. And *State v. Halake,* 102 S.W.3d 661 (Tenn.Crim.App.2001), also cited by the majority, is distinguishable on its facts. In *Halake,* the witness was the officer who had investigated the crime scene, including blood spatter. The prosecution had asked the officer to compare the blood evidence he found at the scene to blood droplets that were only visible using special scientific equipment. Thus, it is not a case where a witness's opinions are based solely on evidence accessible to the jury.

## IV. Application

¶ 68 Here, ordinary citizens could conclude that one photograph showed droplets of blood, while the other showed a large transfer of blood between objects, based on their common experiences and reasoning. Although the prosecutor asked several questions in terms of the detective's "training or experience," the detective distinguished spatter from transfer by drawing rational conclusions based on everyday experiences: droplets can result from "a hand waiving and spraying the blood," while transfer is more like having "a cut on my hand and [then] I touched the table."

¶ 69 These statements are rooted in experiences common among ordinary citizens. The detective did not testify that blood behaves differently from other liquids when transferred or spattered. His repeated statements that "it could be anything" indicate the opposite. Thus, any juror who had used a paintbrush, correcting liquid, or a fountain pen would recognize the difference between a large, smudge-like contact transfer and a non-contact spatter of small droplets. And after viewing the photographs on which the detective relied, any juror could determine which image showed a transfer and which showed a spatter, based on common experience and familiar reasoning. Thus, the detective's definition of spatter and transfer added nothing to the analysis.

¶ 70 While the detective had experience viewing blood at crime scenes that the jurors lacked, the same is true of the officers' experiences in *Rincon* and *Tallwhiteman*. But here, as in those cases, the detective did not interpose between those experiences and his opinion a reasoning process that could be mastered only through specialized training. Thus, merely being questioned based on "training and experience" does not convert experiences into expert testimony.

¶ 71 The detective's opinion is even less dependent on his professional background than were the opinions in *Tallwhiteman* and *Caldwell*. Both cases involved opinions that were based on first-hand knowledge of the defendant or the crime scene. Testimony describing that knowledge would necessarily be filtered through the officers' training and experience.

¶ 72 Here, in contrast, the detective's opinion was based on the photographic evidence offered at trial, from which the jurors could draw their own conclusions. Thus, the majority has erroneously equated a witness's specialized training with expert testimony under CRE 702, even though, as in *Caldwell*, any juror could have drawn a similar conclusion from the photographs based on the juror's own experience.

¶ 73 Because of the way in which the detective explained his conclusions, the prosecutor did not create an aura of expertise. Nor did the detective, as in *State v. McLean*, 205 N.J. 438, 16 A.3d 332, 346 (2011), cited by the majority, use the questions as an opportunity "to offer opinions on defendant's guilt," which that court held to be improper whether offered as lay or expert testimony.

¶ 74 Therefore, in my view, the trial court was correct to admit the detective's testimony as lay opinion under CRE 701. But even if the answer falls somewhere between the majority's view and mine, the question is still close. And when a ruling on an evidentiary question is close, "the ruling of the court should not be interfered with" on appeal. *Mooney v. Carter*, 114 Colo. 267, 271, 160 P.2d 390, 391 (1945).

¶ 75 Accordingly, I would affirm the judgment of conviction.