In the

# United States Court of Appeals

### For the Seventh Circuit

No. 07-3978

UNITED STATES OF AMERICA,

*Plaintiff-Appellee*,

*v.*

DONTRELL ORLAND MOORE,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 07 CR 13—**Theresa L. Springmann**, *Judge.*

ARGUED NOVEMBER 4, 2008—DECIDED JULY 9, 2009

Before POSNER, WOOD, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* In the early afternoon of January 23, 2007, three men robbed a branch of Tower Bank in Fort Wayne, Indiana. During the robbery, at 1:49 p.m., police officers in the Northeast Indiana Federal Bank Robbery Task Force received an automated text message that the bank had been robbed and that a GPS system embedded in the stolen money was transmitting its location. The GPS was designed to begin transmitting

its location as soon as it left the bank drawer where it was kept. Detective Robison, of the Task Force, used a handheld tracker to follow the GPS to the 4200 block of Darby Drive in Fort Wayne. He arrived there ten minutes from the time he received the text indicating the bank had been robbed and joined other law enforcement units that were already in the area at the time. The GPS indicated that it was transmitting within 50 feet of what the GPS identified as 4229 Darby Drive (there is no such address) when it stopped transmitting.

The GPS information, combined with fresh tire tracks at the scene (it was a snowy day), led Robison to believe that the bank robbers had entered the home at 4217 Darby Drive. The police staked out the location, ensuring that nobody came or went, and sought a warrant to enter the home. Fortuitously, Kenyatta Lewis, the 4217 homeowner, arrived home from work with his wife about three hours into the stakeout. The police asked him for permission to search the house, which he granted.

The police first entered the house through the garage, where (because of the tire tracks) the police believed the bank robbers entered. As the police prepared to enter the main part of the house, Joseph Lewis[1], Kenyatta's cousin, walked into the garage and was promptly arrested. The police proceeded through the house to the second floor, where they arrested the defendant, Dontrell Moore,

[1] Avid readers of Seventh Circuit opinions may remember Joseph Lewis from *United States v. Lewis*, 567 F.3d 322 (7th Cir. 2009), where we upheld his conviction for the same robbery.

who was seated on the toilet in the bathroom, and Dawan Warren, who appeared to be sleeping in one of the bedrooms.

In the room where Warren was found, the police spotted an access panel to the attic, and in the attic they found a variety of clothes that did not belong to the Kenyatta Lewis household, including two masks, a hat, a blue pair of nylon sweatpants with a white stripe, and a football jersey. They also found the smashed GPS transmitter taken from the bank, a black bag with an Ozark Trail label, a gun, bait money and money straps from the bank, and currency totaling $9,308. The police also found latex gloves (matching gloves a teller described on the robbers) in the car parked in the garage. The three men, Joseph Lewis, Dawan Warren, and Dontrell Moore, were indicted for bank robbery (count I) and using a firearm during a robbery (count II) and tried separately. At his trial, Moore was convicted of both counts.

He appeals, arguing that the evidence was insufficient to convict him on either count.

## Count I

"A defendant faces a nearly insurmountable hurdle in challenging the sufficiency of the evidence to sustain a conviction." *United States v. Woods*, 556 F.3d 616, 621 (7th Cir. 2009) (quotations and citation omitted). Moore must convince us that even "after viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found him guilty beyond a reasonable doubt." *Id.* "[W]e will overturn a conviction based on

insufficient evidence only if the record is devoid of evidence from which a reasonable jury could find guilt beyond a reasonable doubt." *United States v. Farris*, 532 F.3d 615, 618 (7th Cir. 2008) (citation omitted).

Moore's appeal requires us to articulate the somewhat difficult-to-describe distinction between our role, on review, to correct errors in the trial process and the jury's role, at trial, to act as the final arbiters of the facts of any given case. Our deference to the jury's role is expressed most plainly in *Jackson v. Virginia*, 443 U.S. 307 (1979):

> [T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction must be not simply to determine whether the jury was properly instructed, but to determine whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt. But this inquiry does not require a court to ask itself whether *it* believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.

*Id.* at 318-19 (1979) (quotations and citations omitted) (emphasis in the original).

In other words, our task is not to determine whether or not we think Moore was actually guilty of the bank robbery; we must only ask whether a rational jury could have

believed he was, and believed so beyond a reasonable doubt. A verdict may be rational even if it relies solely on circumstantial evidence. *United States v. Robinson*, 177 F.3d 643, 647 (7th Cir. 1999). The question we must answer is whether "each link in the chain of inferences" the jury constructed is "sufficiently strong to avoid a lapse into speculation." *United States v. Jones*, 371 F.3d 363, 366 (7th Cir. 2004) (quoting *United States v. Peters*, 277 F.3d 963, 967 (7th Cir. 2002)). Complicating matters is that in circumstantial cases "we face head-on the disturbing truth that guilty verdicts rest on judgments about probabilities and those judgments are usually intuitive rather than scientific." *Stewart v. Coalter*, 48 F.3d 610, 614 (1st Cir. 1995).

The task for this jury was to determine whether Dontrell Moore was the man identified by the government as Robber #2—the masked man who was photographed holding a bag as bank employees filled it with money from the bank's vault. The government asked the jury to infer that because law enforcement had arrived at the Darby Drive address within ten minutes of the robbery and found items in the house connected with the robbery along with three men who matched the descriptions given by the bank's employees, the three men robbed the bank. And because, of the three, Dontrell Moore resembled most closely Robber #2, the government contends that there was sufficient evidence for the jury to convict Moore. Furthermore, the government points out that the identification of the other two people in the house, Warren and Lewis, is solid—Lewis, because of his unusually heavy build, and Warren, because the

police took $20 of bait money off him when they booked him into the Allen County Jail (both of these facts were presented to the jury unchallenged).

But we must deal with Moore. His theory of the case is that his description does not really match up with Robber #2's description and that because of the ill fit, the government cannot put Moore in the bank. And, if the government cannot put Moore in the bank, all the government can prove is his presence in the house where the other robbers were caught. "Mere presence," he tells us, is not enough to tag him with a bank robbery conviction. Furthermore, a third of the money from the robbery is missing.[2] This, he argues, supports his theory that even though the other two guys in the house robbed the bank, they did it without him.

The evidence from the bank employees and bank security system is about what you'd expect from a frantic event like a bank robbery. The terrified witnesses often had their eyes closed or avoided directly looking at the robbers; the robbers were masked and generally appear almost as blurs on the stills captured from the bank security feed. It is undisputed that three African-American men robbed the bank; it is also undisputed that at least

---

[2] Actually, according to the Presentence Report, about 40% of the money stolen from the bank was not recovered. Whether this helps or hurts the defendant's case is immaterial because at trial, a government witness testified that "a little more than a third of the money" is missing, and we base our review of the case on the evidence before the jury.

one of the men was shorter and very heavy, a description that matches Joseph Lewis, the cousin of the Darby Drive homeowner (Joseph Lewis is apparently 5'7"-5'8" tall and weighs 280 pounds). Robber #1, Dawan Warren, was identified as wearing a sweatshirt or flannel shirt over a jersey with a Number 7 on it, and this matches up to the jersey found in the attic at Darby Drive.[3]

But Robber #2, who the jury found to be Dontrell Moore, was not so clearly described. Evidence before the jury included descriptions of Robber #2 that estimated his height as anywhere from 5'7" to 6'1". Dontrell Moore is 6'5". Robber #2 was also described as being slender (like Moore) and wearing a ski mask slightly askew so that one of the bank employees could see facial hair (which Moore wore). We can also see from the bank surveillance photos that he appeared to be wearing bluish-green pants and white tennis shoes.[4] The bank photos also seem to confirm the witnesses' description of his attire as being "layered" (perhaps because he was

---

[3] Which, by the way, was a replica of the NFL jersey worn by Michael Vick, previously quarterback for the Atlanta Falcons. Vick has been dogged by legal troubles of his own. *See* Juliet Macur, *Vick Receives 23 Months and a Lecture*, N.Y. TIMES, December 11, 2007, *available at* http://www.nytimes.com/2007/12/11/sports/football/11vick.html.

[4] There is nothing in the record about what Moore was wearing when he was taken into custody. The pants found in the Darby Drive attic had a white stripe but, of course, if worn inside-out they could have been indistinguishable from the pants Robber #2 is described, and photographed, as wearing.

wearing multiple sets of clothing—and remember, a variety of unaccounted-for clothing was found in the Darby Drive home). One employee testified that she saw someone leaving the bank and that he had long hair, possibly in braids or cornrows. Dontrell Moore wore his hair in braided cornrows that, according to his mug shot from the day of the robbery, would possibly hang below the base of a ski mask (although from the testimony it's unclear whether the man the employee saw was wearing a ski mask; neither the defendant nor the government clarified).

Moore points to other evidence, or the lack thereof, to magnify the uncertainty of the identification.[5] For one thing, the missing money led to a second search of the Darby Drive address the day after the robbery. No additional money was found. Moore also alerts us to the fact that the gang apparently ditched a stolen getaway car less than a mile from the bank and switched to Joseph Lewis's car, the one found in the 4217 Darby Drive garage.

---

[5] Bank employees also testified that Robber #2 was carrying a dirty white canvas bag the size of a pillowcase, but the photo of Robber #2 in the vault clearly shows him carrying a black bag with a white design that matches a description of the one taken from the attic introduced at trial. This refutes Moore's argument (made here and before the jury) that the missing dirty white canvas bag points to a different robber. Moreover, because the employees were clearly wrong about the bag Robber #2 was carrying, the jury (who could review the bag and the photos) may have been more likely to excuse the discrepancies in their testimony regarding his height.

Moore uses these facts, developed exclusively in the government's case, to construct the following scenario presented both in his argument on appeal and to the jury. Suppose that a man shorter than Moore (but still taller than Lewis and Warren) robbed the bank with Joseph Lewis and Dawan Warren. Lewis and Warren split up with the man immediately after the robbery and drove to 4217 Darby Drive together and entered the house. Moore joined them there. But because police positioned themselves around the house so shortly after the robbery, we would have to assume that Moore either entered the house to join Warren and Lewis less than ten minutes from the time the bank was robbed or that he arrived with the two before the robbery and remained there while they robbed the bank. Moore argues that either way, this scenario accounts for his presence in the house and takes him out of the bank.

But his hypothesized version of events is implausible at best. Moore did not know the owner of the home in which he was arrested, and the homeowner testified at trial that neither Moore nor the other two men in the house (even the homeowner's cousin) was authorized to be there. The police had the house staked out ten minutes after the robbery and, upon entering, they found that the door from the garage to the home had been busted, apparently recently. The time frame implies that the men in the home did not arrive after the GPS had entered the house and the busted door (along with the homeowner's testimony) tells us that the men had no authorization to be there and that there could be no innocent explanation for their presence. The

lack of innocent explanation is crucial because of the money, clothes, gun, and GPS found in the attic of the home—all of which tied at least one person in the house to the robbery.

In fact, once we are forced to account for Moore's unauthorized presence in the house, we must agree with the government that Moore was not convicted simply on the basis of his presence in the house. Moore's presence in the house cannot be taken in isolation; he was present in the house when police arrived ten minutes after a bank robbery, he resembled a description of one of the robbers, and he wasn't supposed to be in the house. Moore's presence in the house reinforces the strength of his similarity to the eyewitnesses' description of Robber #2. And, because his presence is so suspicious, it was rational for the jury to consider this when deciding that he was one of the robbers.

The defendant overstates the import of our "mere presence" decisions to his case. We have held that "mere presence while a crime is being committed is insufficient to show that a defendant acted to further a conspiracy." *Jones*, 371 F.3d at 366 (quotation omitted). We have also held that testimony placing a defendant at the scene of a beating was not sufficient, "by itself," to prove that he took part in the beating. *Piaskowski v. Bett*, 256 F.3d 687, 692-93 (7th Cir. 2001). In other words, the "mere presence" cases tell us that a defendant cannot be convicted simply for being in a given place. Here, there was a multitude of factors—the eyewitness descriptions of Robber #2, the tracking done by the GPS, the short

window between the robbery and the police presence at 4217 Darby Drive, the unauthorized nature of the defendant's presence in the home, and the evidence from the robbery in the attic panel—that allowed the jury to link his presence in the home to the events at the bank.

And, his presence in the bank is not so far-fetched as to force us to begin constructing elaborate theories to explain away his presence in the house. A witness testified that she saw a man with long hair—"I don't know if it was dreadlocks or braids or what it was"—exiting the bank; this was not rebutted. There is enough testimony for the jury to believe that Robber #2 was the taller one in the bank. While there was a wide range of descriptions regarding his height, all the witnesses indicated Robber #2 was the tallest one. Height is notoriously difficult to gauge and it was up to the jury to resolve the differing descriptions of Robber #2. *See United States v. Crotteau*, 218 F.3d 826, 834 (7th Cir. 2000); *United States v. Hall*, 165 F.3d 1095, 1107-08 (7th Cir. 1999). We are not going to overturn a conviction simply because the government's best witness misjudged Moore's height by 4 inches.

So what we're left with is the missing money. It lends some support to the defendant's thesis that there was another, yet unidentified person, who participated in the robbery, but we can think of a variety of other explanations for its disappearance that conform with the jury's verdict. We could speculate that the money was hidden elsewhere in the house and removed by a third party after the three were taken into custody (note that

this conforms with the belief of the investigators who searched Darby Drive again the day after the arrest. It would also be no surprise if Kenyatta Lewis would consider found money as reasonable compensation for the busting of his door and the use of his home as a bank robbers' lair). We could guess that the money was lost during the hurried switch in cars and was found and pocketed by a not-so-good Samaritan passing by the abandoned car or that a "getaway" driver arranged for the theft of the vehicle later abandoned, drove the robbers to Joseph Lewis's car, and left with his or her share (or more) of the loot. We could guess that the money was discarded or destroyed by defendants who were worried it was bait money. We could guess that a traumatized bank employee took an unauthorized bonus, justifying it as a form of hazard pay (or took the opportunity the robbery presented to conceal earlier embezzlement). We can't know—but the fact of the missing money was fully argued to and presumably considered by the jury, and they resolved it in the government's favor. The chance that a different Robber #2 is on the loose is not so great as to render a verdict against Moore irrational.

"[V]ariations in human experience suggest that one should expect a considerable range of reasonable estimates about what is likely or unlikely." *Stewart*, 48 F.3d at 616. It seems to us that the problems with Moore's theory of events are more serious than the problem with the missing money in the version inculpating Moore, which the jury adopted. We cannot say that his proffered scenario is impossible, but we simply note that Moore's unexplained presence in the house makes the resolution of the other issues in the case easier.

"Guilt beyond a reasonable doubt cannot be premised on pure conjecture. But a conjecture consistent with the evidence becomes less and less a conjecture, and moves gradually toward proof, as alternative innocent explanations are discarded or made less likely." *Id.* at 615-16. Given that there was no credible explanation for Moore's presence in the house, as well as the time frame involved and Moore's physical characteristics in comparison with those described by the robbery victims, it was rational for the jury to choose the government's theory of the case. Although this was a close circumstantial case, there was enough evidence of Moore's guilt to support the verdict. The conviction must stand.

**Count II**

It is easier to dispense with Moore's dispute with his conviction on the firearm count. Moore argues that even if the jury could find that he was Robber #2, there was insufficient evidence for the jury to convict him of using or carrying a firearm during the robbery in violation of 18 U.S.C. § 924(c). Section 924(c) punishes a person who, "during or in relation to any crime of violence . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm." Even though Moore did not personally carry a gun, the jury was given an aiding and abetting instruction; Moore argues that there was insufficient evidence offered to prove that he aided and abetted the offense.

Proving that a defendant aided and abetted the use of a firearm requires evidence that "(1) the defendant

knew, either before or during the crime, of the principal's weapon possession or use; and (2) the defendant intentionally facilitated that weapon possession or use once so informed." *United States v. Taylor*, 226 F.3d 593, 596 (7th Cir. 2000). "Merely aiding the underlying crime and knowing that a gun would be used or carried cannot support a conviction under 18 U.S.C. § 924(c)." *United States v. Woods*, 148 F.3d 843, 848 (7th Cir. 1998). But, "[o]nce knowledge on the part of the aider and abetter is established, it does not take much to satisfy the facilitation element." *Id.* (quotation omitted).

Here, if we review the facts in the light most favorable to the government, we find that Warren ran into the building with a gun. He ordered the bank employees to let Moore into the teller area. Warren, carrying the gun, and Moore went to the vault with the bank employees. Warren left (to loot the teller drawers) and Moore held a bag while the bank employees filled the bag with money. Then, Warren and Moore left the bank, joined by Lewis, who had been out on the bank floor. Moore argues that a jury could only determine from the evidence at trial that he knew of Warren's firearm possession when they entered the vault together but not before. Moore argues that after this point, where his knowledge was established, there was no evidence that he facilitated the use of this firearm in the robbery. Moore concedes that a division of labor between armed and unarmed robbers during a robbery may be sufficient to satisfy facilitation, *Woods*, 148 F.3d at 848, but argues that such a division did not occur here.

It is undisputed that Warren used the gun to force the tellers to assist Moore in looting the vault. Moore's work with the tellers reduced the time needed for the crime, a fact that is sufficient to establish facilitation. While Warren gathered cash from the teller drawers, Moore was in the vault with a bag taking money from the bank employees. The jury could certainly infer that Moore's gathering of the cash made both robbers able to accomplish the robbery more quickly. This would satisfy the facilitation prong of the aiding and abetting inquiry. *See Taylor*, 226 F.3d at 597 (finding that the defendant's assistance to the armed co-defendant met the facilitation element); *Woods*, 148 F.3d at 848 ("[T]he use of the gun in the bank expedited [co-defendant's] looting of the teller's cash drawer, reducing the amount of time the robbery took.").

## Conclusion

Because the jury could rationally connect the dots from Moore's presence in the house to the description of Robber #2, and because Moore's work in the bank vault aided and abetted Warren's use of the firearm, there was sufficient evidence to convict the defendant on both counts. His conviction is AFFIRMED.

---