In the

# United States Court of Appeals
## For the Seventh Circuit

No. 14-3791

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

DAVID A. RESNICK,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Indiana, Hammond Division.
No. 2:11 CR 68 — **James T. Moody**, *Judge.*

ARGUED OCTOBER 26, 2015 — DECIDED MAY 4, 2016

Before WOOD, *Chief Judge*, and BAUER and SYKES, *Circuit Judges*.

WOOD, *Chief Judge*. During the summer of 2008, David Resnick, a long-haul truck driver, took T.M., the nine-year-old son of family friends, on a cross-country work trip that was supposed to end at Disneyland. They never got there. Instead, they traveled to Washington State and back to Indiana. Over the two-week trip, Resnick sexually abused T.M. repeatedly. Eventually, T.M. told his parents about Resnick's conduct and

Resnick was charged with a variety of child-abuse and firearms offenses. After a four-day trial, a jury convicted Resnick on all four counts.

Resnick challenges his convictions on three bases. He argues that the evidence presented at trial was insufficient to prove beyond a reasonable doubt that he was guilty of the charge of brandishing a firearm. He also contends that his remaining convictions should be reversed because the district court erred in admitting testimony of a second minor victim and in allowing testimony and argument about Resnick's refusal to take a polygraph. Ultimately, all of Resnick's arguments fail. With respect to the references to a polygraph (that never occurred), however, we stress that our result is heavily influenced by the fact that we are reviewing only for plain error. See *United States v. Olano*, 507 U.S. 725, 732 (1993); FED. R. CRIM. P. 52(b). This evidence, to the extent it is admissible at all, must be used with great caution. Resnick, however, forfeited his objection to this evidence at trial, and because we find no plain error, we affirm.

# I

In 2008, T.M. was nine years old and lived in Indiana with his mother and stepfather. Resnick was a friend of the family who sometimes took T.M. and his siblings to dinner or gave them gifts. In July 2008, T.M.'s parents allowed him to accompany Resnick on a two-week, cross-country work trip. T.M. believed that they would go to Disneyland, and that it would be his job to care for Resnick's puppy.

T.M. was badly mistaken. Throughout the trip, Resnick sexually abused him, subjecting him to pornography, sexual touching, oral sex, and forcible sodomy. One night, as they

were traveling through Washington, Resnick drove by a weigh station without stopping. Washington State Patrol Officer Lace Koler pulled over Resnick's rig. Before Koler walked up to the truck, Resnick put a pistol against T.M.'s head. "If you tell anybody," Resnick said, "I will kill you and your family." T.M. kept silent. Resnick and T.M. returned to Indiana, and T.M. went home. At that time, he told no one about the abuse he experienced on the trip.

Some time after they returned, Resnick invited T.M. and his friend K.M. to a "pool party" at a local Comfort Inn. K.M. was eight years old. There were no other children at the party, and the two boys were to spend the night alone with Resnick in the hotel. Knowing what was in store, T.M. fought with K.M. and threw a cell phone against the wall. He was sent home, leaving K.M. alone with Resnick. Over the course of the night, Resnick showed K.M. a firearm and allowed him to hold it. They slept in the same bed, and Resnick sexually abused K.M. When K.M. returned home, he initially did not tell his mother what Resnick had done to him. But that November, he confided in her, and she called the police.

In April 2011, law enforcement personnel searched Resnick's house in Florida. They found more than 66 hours of video of minors being sexually abused or exploited. Among the items seized was a laptop that T.M. later identified as the one Resnick brought on their 2008 trip. During the execution of the search warrant, Resnick was interviewed by FBI Special Agents Matt Chicantek and Lana Sabata. Chicantek asked Resnick about T.M. and K.M.'s accusations of abuse.

At first, Resnick said that he did not know T.M. and K.M. at all. Then he backpedaled with a denial of any inappropriate behavior. He stated that he could not remember a traffic stop

in Washington on his 2008 trip with T.M., and denied staying overnight alone with K.M. at the hotel. He also denied having carried a firearm since his felony conviction in 2000. When Chicantek asked Resnick whether he would be willing to take a polygraph exam, Resnick demurred, saying he would have to talk to a lawyer first and noting that polygraph exams were unreliable. Resnick was later arrested and indicted in the Southern District of Florida for possessing child pornography in violation of 18 U.S.C. § 2252(a)(4)(B). He pleaded guilty.

At the same time, Resnick was indicted in the Northern District of Indiana on charges related to his abuse of T.M. The Indiana charges included aggravated sexual abuse of a minor, interstate transportation of child pornography, brandishing a firearm in furtherance of a crime of violence, and being a felon in possession of a firearm, in violation of 18 U.S.C. §§ 2241(c), 2252(a)(1), 924(c)(1)(A)(ii), and 922(g)(1).

Resnick elected to go to trial on the Indiana charges. Before trial, the government gave notice that it intended to proffer evidence of Resnick's abuse of K.M. Resnick filed a motion *in limine* to exclude that evidence. The district court denied Resnick's motion, finding the evidence admissible under Rules 414 and 403 of the Federal Rules of Evidence.

Resnick chose not to take the stand at trial. On the third day of the trial, the government introduced evidence during its direct examination of Agent Chicantek that Resnick had denied any abuse of T.M. or K.M. and had declined to take a polygraph. Resnick's counsel did not object. On cross-examination, Resnick's counsel asked Chicantek if Resnick had sought an attorney during the interview. Chicantek replied that the only time Resnick mentioned a lawyer was when he

said that, "before he took a polygraph he would want to con-sult with an attorney." Later during cross-examination, Resnick's counsel also noted, through a leading question, that Resnick had said that he wanted to speak with a lawyer before taking a polygraph exam. On redirect, Chicantek stated that Resnick had said that he did not want to take the polygraph because "everyone knows that whoever is operating the polygraph machine can manipulate it to say whatever they want to say or the results to be whatever they want them to be." Chicantek also noted that, to his knowledge, Resnick never took a polygraph examination. During their closing arguments, the government and Resnick's counsel each made one reference to Resnick's refusal to take a polygraph.

The jury convicted Resnick on all four counts. The district court sentenced him to life imprisonment, plus a mandatory consecutive seven-year sentence for the brandishing count. It entered judgment and sentence that day. Resnick filed a timely notice of appeal.

## II

Resnick contends that the government presented insuffi-cient evidence to convict him of the brandishing count. He argues that his remaining convictions should be reversed be-cause the district court erred by admitting evidence of his abuse of K.M. and by admitting evidence that he refused to take a polygraph examination.

## A

We first consider Resnick's attack on the sufficiency of the evidence supporting the conviction for brandishing a weapon in violation of 18 U.S.C. § 924(c)(1)(A)(ii). He faces a difficult standard of review, under which we ask only whether,

"viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The reviewing court must "give[] full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Id*.

In relevant part, section 924(c)(1)(A)(ii) punishes any person who, "during and in relation to any crime of violence ... for which the person may be prosecuted in a court of the United States ... uses or carries a firearm" and "brandish[es]" it in furtherance of the crime. Section 924(c)(1)(A)(ii)'s "brandishing" is a fact that increases the minimum penalty for the crime, and therefore "is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013).

The government had to prove that Resnick committed a crime of violence and that he knowingly brandished a firearm during and in relation to the crime. See *United States v. Castillo*, 406 F.3d 806, 812 (7th Cir. 2005). Resnick accepts that the underlying crime of violence was proved beyond a reasonable doubt. See *United States v. Munro*, 394 F.3d 865, 870 (10th Cir. 2005) (sexual abuse of a minor is a crime of violence). He also concedes that there was sufficient evidence for the jury to find beyond a reasonable doubt that Resnick "threatened [T.M.] to prevent him from complaining to Officer Koler and that in doing so he used some object that he wanted [T.M.] to believe was a gun." But, Resnick says, the evidence was insufficient to prove that that object actually *was* a gun.

Resnick contends that the government's proof was inade-
quate because T.M. was the only witness to the brandishing
and was not sure that he saw a gun. The fact that there were
no other witnesses, however, is beside the point: one eyewit-
ness is sufficient to prove a crime beyond a reasonable doubt.
*United States v. Payton*, 328 F.3d 910, 911 (7th Cir. 2003).

Resnick overstates the case when he complains of T.M.'s
alleged uncertainty. In his testimony, T.M. confirmed many
times that Resnick had used a gun to threaten him. T.M. saw
the gun well enough to be able to draw a picture of it. He
identified a photograph of the model of gun he believed
Resnick had used and specified that it was a "German Luger."
He was also able to pinpoint where the gun was located in the
truck cab. Additionally, Tim Podgorski, Victor Savia, Byron
Owen, Rocco Rigsby, and K.M. all testified that they regularly
saw Resnick with guns. Podgorski and Owen added that
Resnick took guns on work trips. Podgorski testified that he
had seen a thin-barreled Luger in Resnick's father's shop that
was similar to the one that T.M. drew.

Resnick makes much of two moments during T.M.'s testi-
mony when T.M. expressed a bit of uncertainty. On direct
examination, the prosecutor asked T.M., "As you sit here to-
day, do you know what kind of gun it was that David put up
against your head?" T.M. answered, "Not exactly, no." The
government then asked T.M., "Are you sure it was a gun?"
T.M. responded, "Pretty sure, ma'am." Similarly, while asking
how well T.M. saw the gun during the brandishing on cross-
examination, defense counsel asked, "So you never saw the
gun, did you?" T.M. responded, "Not a hundred percent."

In order for this testimony to be sufficient to sustain Resnick's conviction, T.M. need not be metaphysically positive that Resnick was using a gun. See *United States v. Moore*, 572 F.3d 334, 337 (7th Cir. 2009) (noting that in circumstantial cases "guilty verdicts rest on judgments about probabilities" (quoting *Stewart v. Coalter*, 48 F.3d 610, 614 (1st Cir. 1995))). The government was not required to prove that the object—which T.M. saw, drew, identified, and felt as a gun while being threatened—was *not* something other than a gun. See *Jackson*, 443 U.S. at 326 (prosecution does not have an "affirmative duty to rule out every hypothesis except that of guilt beyond a reasonable doubt"); *Harmon v. McVicar*, 95 F.3d 620, 623 (7th Cir. 1996) ("The State need not exclude every reasonable hypothesis of innocence."). Finally, Resnick's characterization of T.M.'s "pretty sure" as an equivocation demonstrates why reviewing courts must leave inferences based on witness demeanor to the trier of fact. See *United States v. Woody*, 55 F.3d 1257, 1264 (7th Cir. 1995). Depending on T.M.'s inflection, "pretty sure" could have denoted hesitation, great certainty, or something in between. It was reasonable to infer that the object T.M. said he was "pretty sure" was a gun was actually a gun—and it was an inference for the jury to make.

Similarly, T.M.'s "not a hundred percent" on cross-examination could, in context, just as easily be interpreted as describing *how much* of the gun he saw, rather than his certainty that it was a gun. And just because someone is not one hundred percent sure does not mean that he or she is *unsure*—few things in life are one hundred percent certain. In any event, T.M. clearly believed he was threatened with a gun. Evaluating T.M.'s credibility was the jury's prerogative. See *United States v. Patterson*, 23 F.3d 1239, 1244–45 (7th Cir. 1994). Together with testimony that Resnick habitually carried a gun

on work trips, T.M.'s testimony made the jury's inference that the object Resnick brandished while threatening T.M. was a gun "sufficiently strong to avoid a lapse into speculation." *Moore*, 572 F.3d at 337. The evidence at trial was sufficient to support Resnick's conviction for brandishing a firearm during a crime of violence.

B

Resnick next contends that the district court misinterpreted Federal Rule of Evidence 414 to create a presumption of admissibility, and that it abused its discretion under Rule 403 in admitting K.M.'s testimony that Resnick abused him. We review the district court's interpretation of the rules of evidence *de novo*, *United States v. Schmitt*, 770 F.3d 524, 530 (7th Cir. 2014), and its evidentiary rulings for abuse of discretion. *Id.* at 532.

Rule 414(a) states that "evidence of the defendant's commission of another offense … of child molestation" is admissible "in a criminal case in which the defendant is accused of an offense of child molestation." *United States v. Miller*, 688 F.3d 322, 327 (7th Cir. 2012) (quoting FED. R. EVID. 414(a)). The district court must conduct a two-step inquiry in evaluating evidence under Rule 414. First, it must decide whether the evidence falls under that rule. Then it must turn to Rule 403 and "assess the risk of unfair prejudice" the evidence poses. *Id.* This inquiry is required because "[e]ven if the evidence does not create unfair prejudice solely because it rests on propensity, it may still risk a decision on the basis of something like passion or bias—that is, an improper basis." *Id.* (quoting *United States v. Rogers*, 587 F.3d 816, 822 (7th Cir. 2009)). Rule 414 therefore confers no presumption of admissibility. See *Rogers*, 587 F.3d at 822 (explaining that Rule

413 does not "reverse" a presumption against admissibility because Rule 404(b) does not create a presumption against admissibility, but rather bars certain inferences).

The district court's opinion stated: "RULE 414 trumps the restriction in RULE 404(b) by creating a presumption in favor of admitting propensity evidence." This statement was erroneous, but we conclude that the error was harmless. There is no evidence that the district court in fact applied a presumption of admissibility in evaluating the evidence. Instead, it specifically noted that it had to "carefully consider" whether the evidence "should be excluded pursuant to Rule 403." It conducted this inquiry dutifully.

The district court found K.M.'s testimony highly proba-tive. It correctly noted that Resnick's sexual abuse of K.M. constituted another "act of child molestation" under Rule 414. It stated that "there is no doubt that the alleged act against [K.M.] is relevant because [it is] indicative of a propensity to commit the act charged involving [T.M.]." The district court also noted that Congress had found that "in child molestation cases ... a history of similar acts tends to be exceptionally probative because it shows an unusual disposition of the defendant ... that simply does not exist in ordinary people." *United States v. Hawpetoss*, 478 F.3d 820, 824 n.7 (7th Cir. 2007).

Later, the district court weighed the risk that the testimony would result in unfair prejudice against Resnick. It noted that "all child abuse and molestation is extremely disturbing, but speaking in relative terms, the alleged incident that K.M. will testify about is mild in comparison to [T].M.'s expected testimony concerning the same charge at issue." The court therefore concluded that the risk of unfair prejudice in admitting K.M.'s testimony was not too high. This line of

reasoning is well-established. See, *e.g.*, *United States v. Scop*, 940 F.2d 1004, 1009 (7th Cir. 1991) (holding "evidence … was not unduly prejudicial" because "[i]t concerned truly similar activities rather than inflammatory criminal acts"). The court also observed that uncharged molestation evidence is generally admitted under Rule 403 even when similar to the charged conduct. See *United States v. Roux*, 715 F.3d 1019, 1026 (7th Cir. 2013) (collecting cases).

Resnick also argues that the district court should have issued a contemporaneous instruction limiting K.M.'s testimony to the "relevant testimony [he had] to offer on subjects other than propensity." But Resnick did not request any such instruction at the time, nor did he object to the eventual instruction at trial. We thus review this point only for plain error. *United States v. Reese*, 666 F.3d 1007, 1016 (7th Cir. 2012).

There is no rule requiring the court to give even an unsolicited limiting instruction when potentially prejudicial testimony is offered. See *United States v. Papia*, 560 F.2d 827, 840 (7th Cir. 1977) (timing of limiting instruction is left to "sound discretion of the trial judge"). Resnick argues that the eventual instruction was "long, multifaceted, and difficult to understand," but he does not say how or why. Neither does he indicate how K.M.'s testimony should have been limited. In any event, because the testimony was properly admitted for any purpose, no limiting instruction was required. See *United States v. Wilson*, 31 F.3d 510, 515 (7th Cir. 1994) (lack of limiting instruction not abuse of discretion where evidence properly admitted). The district court's decision to give its instruction at the close of evidence was not an abuse of discretion, let alone plain error.

C

Finally, we come to the most troublesome issue on this appeal: the district court's decision to admit evidence that Resnick refused to take a polygraph exam. Because Resnick did not contemporaneously object to the evidence at trial, we review this decision for plain error. *Puckett v. United States*, 556 U.S. 129, 135 (2009). In order to qualify as "plain error," the error must be plain and "affect[] substantial rights." *United States v. Olano*, 507 U.S. 725, 732 (1993) (quoting FED. R. CRIM. P. 52(b)). An error is not plain "unless [it] is clear under current law" and not "subject to reasonable dispute." *Id.* at 734. And while the reviewing court has discretion to correct such an error, it "should not exercise that discretion unless the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *Id.* at 732 (internal quotation marks omitted).

Resnick contends that it was plain error to admit evidence of his refusal to take a polygraph exam because the technique is fundamentally untrustworthy. His argument seems to be that, given the unreliability of the technique and the ease of manipulation, his refusal has no probative value. Essentially, he seems to say, the police might as well have asked him if he would submit to a horoscope or a tarot reading. But while little prejudice (in most circles) would attach to someone who declined examination using those techniques, a jury may believe that a person who refuses to take a polygraph has something to hide.

Polygraph evidence has faced sharp criticism, largely because of serious doubts about its scientific or probative value. See, *e.g.*, *United States v. Scheffer*, 523 U.S. 303, 309 (1998) ("[T]here is simply no consensus that polygraph evidence is

reliable. … [T]he scientific community remains extremely polarized about the reliability of polygraph techniques."); *United States v. Lea*, 249 F.3d 632, 639 (7th Cir. 2001) (noting that, despite their discretion, "'district judges often exclude[] such evidence 'because doubts about the probative value *and* reliability of this evidence' outweigh[] any rationale for admission" (quoting *United States v. Dietrich*, 854 F.2d 1056, 1059 (7th Cir. 1988))); *United States v. Dinga*, 609 F.3d 904, 908 (7th Cir. 2010) (noting that an "offer of a willingness to submit to a polygraph 'is so unreliable and self-serving as to be devoid of probative value'" (quoting *United States v. Bursten*, 560 F.2d 779, 785 (7th Cir. 1977)); *United States v. Rodriguez-Berrios*, 573 F.3d 55, 73 (1st Cir. 2009) (holding that "[p]olygraph results are rarely admissible" because they have "long been considered of dubious scientific value" (quotation and citation omitted)); *United States v. Gill*, 513 F.3d 836, 846 (8th Cir. 2008) (dubbing polygraph evidence "disfavored").

Several of our sister circuits have taken the step of adopting a *per se* rule excluding polygraph evidence. See, *e.g.*, *United States v. Sanchez*, 118 F.3d 192, 197 (4th Cir. 1997) (*en banc*); *Rothgeb v. United States*, 789 F.2d 647, 651 (8th Cir. 1986); *United States v. Russo*, 796 F.2d 1443, 1453 (11th Cir. 1986). They have done so out of a concern that there is no reliable way for the district courts to separate sound polygraph results from unreliable ones. They also note, with good reason, that polygraph evidence entails a significant possibility of unfair prejudice. The Supreme Court has recognized that "the aura of infallibility attending polygraph evidence can lead jurors to abandon their duty to assess credibility and guilt." *Scheffer*, 523 U.S. at 314. The danger of prejudice is especially high given that "a judge cannot determine, when ruling on a

motion to admit polygraph evidence, whether a particular polygraph expert is likely to influence the jury unduly." *Id.*

It is thus no surprise that our decisions have, in practice, pointed in only one direction: affirming the *exclusion* of polygraph evidence. There is no scientific consensus that polygraph testing is reliable, and there is a significant possibility of unfair prejudice if it is introduced into evidence at trial.

That said, we have not yet adopted a blanket rule excluding the use of polygraph evidence in federal prosecutions. Given the standard of review, this case is not the right one in which to take that step. We have given district courts "considerable deference" on the issue, indicating that the decision to admit polygraph evidence "will be reversed only when the district court has abused its discretion." *United States v. Ross*, 412 F.3d 771, 773 (7th Cir. 2005) (quoting *United States v. Lea*, 249 F.3d 632, 638 (7th Cir. 2001)). This alone makes it inappropriate for us to say that it was plain error to admit evidence related to a polygraph in the absence of some extraordinary reasons not suggested here. *Olano*, 507 U.S. at 732 (error not plain "unless [it] is clear under current law"). The law is not settled, and the case against Resnick was airtight. Moreover, this case is not in the end about polygraph evidence: it is about evidence of a *refusal* to take a polygraph.

But the latter point moves us from one problem to another one with constitutional overtones. Agent Chicantek's testimony did not describe the result of a polygraph test; he instead revealed that Resnick had refused to take the test before talking to a lawyer. A polygraph examination is almost always a custodial interrogation. See *Oregon v. Elstad*, 470 U.S. 298, 304 (1985) (*Miranda* rights attach in custodial setting). Therefore, "absent a waiver of [F]ifth [A]mendment rights, a

person may not be compelled to submit to a polygraph examination." *Garmon v. Lumpkin Cnty., Ga.*, 878 F.2d 1406, 1410 (11th Cir. 1989). Because a criminal defendant's constitutionally protected silence may not be used against her, the "natural corollary to that rule" is that generally "a defendant's refusal to submit to a polygraph examination cannot be used as incriminating evidence." *Id.*; see also *United States v. St. Clair*, 855 F.2d 518, 523 (8th Cir. 1988) (noting, without stating grounds, that "[t]he Eighth Circuit has held it is improper for a witness to testify whether or not a criminal defendant refused to submit to a polygraph test").

Resnick was interviewed during the execution of a search warrant on his home. The officers read him his *Miranda* rights before questioning him. Generally, a criminal defendant's silence after he has been read his *Miranda* rights may not be introduced against him at trial. See *Doyle v. Ohio*, 426 U.S. 610, 618 (1976). But Resnick was not silent. He gave exculpatory answers to a number of questions. Then, when asked whether he would take a polygraph, Resnick said that he wanted to consult with an attorney first. The fact that Resnick gave exculpatory answers before declining the polygraph complicates matters. In a noncustodial setting, where a "defendant starts down an exculpatory path" and then refuses to expand on those statements, the use of his later silence at trial does not violate the Fifth Amendment. See *United States v. Bonner*, 302 F.3d 776, 783–84 (7th Cir. 2002) (citing *United States v. Davenport*, 929 F.2d 1169, 1174 (7th Cir. 1991)). Since the interaction between Resnick and the officers appears to have been voluntary up to the point when the polygraph issue came up, this rule might apply. On the other hand, Resnick's refusal to take a polygraph was not selective silence in response to specific questions. Rather, it was a wholesale

refusal to answer questions in a particular *setting*. Under these circumstances, Resnick's refusal to submit to a polygraph resists easy Fifth Amendment categorization.

Ultimately, however, the proper characterization does not matter here. A Fifth Amendment self-incrimination violation is not structural error. See *Chapman v. California*, 386 U.S. 18, 24 (1967) (holding Fifth Amendment self-incrimination error not grounds for reversal of conviction if proven harmless "beyond a reasonable doubt"); *Jumper*, 497 F.3d at 703 (same). Thus, if the district court committed Fifth Amendment error (a question we need not decide), we must still decide whether any such error was "plain." We have never before held that the refusal to take a polygraph implicates the Fifth Amendment. Moreover, Resnick's refusal to take a polygraph was mentioned only once by each side during closing, the evidence against him was very strong, and his defense did not depend on his credibility because he did not take the stand at trial. It is Resnick's burden to "make a specific showing of prejudice" in order to satisfy the "substantial rights" part of the plain error analysis. *Olano*, 507 U.S. at 735. He has not done so. The dissent overstates matters when it says, *post* at 7, that "only an innocent defendant could have his conviction reversed" under the approach to plain error we have taken. Any defendant who can point to an error that affected his "substantial rights" (and the other criteria of *Olano*) can show plain error. Resnick's problem is that any error in admitting the testimony about his reluctance to submit to a polygraph was not plain and did not affect his substantial rights in light of the record as a whole. It therefore does not support reversal of his conviction.

**III**

The evidence at trial was sufficient to sustain Resnick's brandishing conviction. The district court did not abuse its discretion in admitting K.M.'s testimony, nor did it commit plain error in the timing or content of its instruction limiting that testimony. Finally, the admission of testimony revealing that Resnick refused to submit to a polygraph was not plain error. The judgment of the district court is therefore AFFIRMED.

BAUER, *Circuit Judge,* dissenting. I would remand this case for retrial. I believe that the district court committed reversible plain error by admitting Resnick's refusal to submit to a polygraph examination into evidence and allowing the government to comment on this refusal during closing arguments. These actions virtually exclude the possibility of Resnick receiving a fair trial.

Our standard of review—plain error—is a "high bar," *see United States v. Love*, 706 F.3d 832, 841 (7th Cir. 2013), but it should not be an impenetrable shield. Here, the introduction of the refusal to take the polygraph and the government's subsequent comments constituted plain error which polluted the other evidence and compromised the entire trial. It had the effect of replacing the jury as factfinder and convicting Resnick by judicial fiat, not by the evidence presented. Because such actions prejudiced Resnick and seriously called into question the fairness, integrity, or public reputation of his trial, I would remand.

The district court's errors were constitutional and evidentiary in nature. First, it was plain constitutional error to admit Agent Chicantek's testimony that Resnick refused to take a polygraph and to allow comment on the refusal. This violated Resnick's Fifth Amendment right against self-incrimination, on which our precedent is clear and obvious. *See Puckett v. United States*, 556 U.S. 129, 135 (2009). The Self-Incrimination Clause of the Fifth Amendment states that "[n]o person … shall be compelled in any criminal case to be a witness against himself." *See also United States v. Manjarrez*, 258 F.3d 618, 623 (7th Cir. 2001) (quoting *Rock v. Arkansas*, 483 U.S. 44, 51 (1987) ("the defendant's right to testify is a fundamental constitutional right 'essential to due process of law in a fair adversary process'" (other citations omitted)). This Fifth Amendment

right incorporates a right to consult an attorney before speaking to police as well as a right to remain silent when facing custodial interrogation. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). This right is absolute, not situational. *See id*. at 479 (right against compelled testimony is absolute and "cannot be abridged"); *Greene v. Finley*, 749 F.2d 467, 472 (7th Cir. 1984) ("the constitutional privilege against self-incrimination … grant[s] … an absolute right"). Further, the government is "prohibit[ed] … from 'treat[ing] a defendant's exercise of his right to remain silent at trial as substantive evidence of guilt.'" *United States v. Ochoa-Zarate*, 540 F.3d 613, 617 (7th Cir. 2008) (quoting *United States v. Robinson*, 485 U.S. 25, 34 (1988)).

If a defendant refuses to testify or invokes his *Miranda* rights, the prosecutor cannot comment on this refusal to the jury. *Miranda*, 384 U.S. at 468 n.37 ("[I]t is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation."); *United States v. Tucker*, 714 F.3d 1006, 1015 (7th Cir. 2013) (citing *Griffin v. California*, 380 U.S. 609, 612–13 (1965)) ("A prosecutor may not make comments, either directly or indirectly, that lead the jury to draw a negative inference from a defendant's decision not to testify." (Other citation omitted)). The government violates a defendant's right against self-incrimination if "it manifestly intended to refer to her silence" when arguing to the jury. *United States v. Phillips*, 745 F.3d 829, 834 (7th Cir. 2014) (quotation marks, citation, and brackets omitted).

Here, the government not only used Resnick's refusal to take a polygraph examination as substantive evidence of consciousness of guilt, but also manifestly referred to this refusal when arguing to the jury. As the majority notes, a polygraph examination is a custodial interrogation. The specific inquiry which Chicantek propounded was whether

Resnick wanted to continue to answer questions about his activity with T.M. and K.M. A trained polygraph operator that the government selected would propose these questions. Resnick refused to submit to this test, as was his constitutional right, and added: first, that he would not considering taking a polygraph examination until he spoke with a lawyer; and second, that "whoever is operating the machine can manipulate it to say whatever they want to say or the results to be whatever they want them to be." Resnick was later arrested, was appointed counsel, and *continued* to refuse to take a polygraph.

I see this as a clear and obvious example of someone refusing to testify against himself. Having exercised his right, the government absolutely could not (1) use his refusal as substantive evidence against him or (2) comment on the silence to the jury. *See Griffin*, 380 U.S. at 612–13; *Tucker*, 714 F.3d at 1015; *Ochoa-Zarate*, 540 F.3d at 617. Yet the government did *both*, offering Chicantek's testimony about Resnick's refusal into evidence and arguing to the jury that the refusal evidenced guilt. After Chicantek disclosed the refusal to answer further questions, he also testified that Resnick *did* talk to a lawyer but still did not submit to a polygraph test. The implication is clear: even Resnick's lawyer considered him a liar. All of this occurred without an admonition from the judge or apparently without a sense of law and fairness on the part of the prosecution.

After all of this, to add further prejudicial unfairness to the trial, the government argued to the jury that the refusal to take the polygraph demonstrated Resnick's consciousness of guilt. The majority mentions this comment to the jury as "one reference," but this reference was notable. The government stated, "Last but not least, I want to leave you with the defen-

dant's lies." It then published a demonstrative exhibit listing Resnick's answers to the April 27, 2011, interview questions. The government noted that in addition to various other denials, Resnick "refused to take a polygraph regarding his sexual abuse of [T.M.] and [K.M.]." The government continued: "And, yeah, he said, I should talk to a lawyer before I do that. Well, guess what, he talked to a lawyer. There was no polygraph." The government argued that this refusal, coupled with other denials, evidenced Resnick's consciousness of guilt regarding sexual abuse of T.M. and K.M.

Under *Griffin*, *Miranda*, and their respective progeny, a suspect like Resnick should feel empowered to refuse any interrogation, including interrogation via polygraph. Here, Resnick knew that he had this right, repeatedly and expressly refused to take the polygraph test, and yet had this refusal used against him. *Compare United States v. Salinas*, 133 S. Ct. 2174, 2179–80 (2013) (criminal defendant did not have Fifth Amendment protection because he did not expressly invoke his right to remain silent while under custodial interrogation). This contravenes the spirit of *Griffin*, *Miranda*, and all other pertinent Fifth Amendment jurisprudence from the last fifty years. The district court's failure to recognize the government's obvious violation of Resnick's Fifth Amendment right constitutes plain error.

Compounding the district court's plain constitutional error was its plain evidentiary error. Admitting a refusal to submit to a polygraph examination into evidence mistakenly assumes that polygraphs are reliable forms of evidence. This belies our precedent, which has consistently stated that polygraphs are *not* reliable forms of evidence. The majority ably describes the suspicion with which we and other circuits regard polygraph evidence. Polygraphs have their use in employment settings,

*see, e.g.*, *Veazey v. Commc'ns & Cable of Chicago, Inc.*, 194 F.3d 850, 854–58 (7th Cir. 1999), but their unreliability makes their results extremely problematic when offered as evidence in a criminal trial. *See United States v. Scheffer*, 523 U.S. 303, 309–10 (1998) (noting that the government has "a legitimate interest in ensuring that reliable evidence is presented to the trier of fact in a criminal trial," that "there is simply no consensus that polygraph evidence is reliable," and that "the scientific community remains extremely polarized about the reliability of polygraph techniques").

Yet, as the majority notes, polygraph tests still carry an "aura of infallibility" in the minds of many jurors. *Id.* at 314. This may lead jurors to give inappropriate credence to poly-graphs findings; they could trust the polygraph more than their own instincts and sensibilities. In instances where scientific research conflicts with public perception of scientific evidence, the court must be particularly vigilant in exercising its role as gatekeeper. *See* Fed. R. Evid. 702(c); *Brown v. Burlington N. Santa Fe Ry. Co.*, 765 F.3d 765, 771–72 (7th Cir. 2014); *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579, 597 (1993).

The thrust of our jurisprudence on polygraphs establishes that they are unreliable tools for finding truth, and have limited value as criminal evidence. *See United States v. Lea*, 249 F.3d 632, 638 (7th Cir. 2001) (quoting *Scheffer*, 523 U.S. at 309–10) ("[T]he scientific community remains extremely polarized about the reliability of polygraph techniques."). As the majority writes, our decisions regarding introduction of polygraph evidence have reflected this concern, as we have "in practice" only "affirm[ed] the *exclusion* of polygraph evidence." We give wide discretion to district courts to disabuse jurors of the notion that polygraphs are valid evi-

dence. We have *never* given discretion to admit a refusal to take a polygraph, because we have *never* deemed polygraphs inherently reliable.

The district court's actions constitute plain error on either legal front: it violated Resnick's right against self-incrimination and it inflicted unfair prejudice by admitting historically unreliable evidence. But the convergence of these two legal issues solidifies the plainness of the district court's error. Even if not explicit, our jurisprudence on both issues is clear.

By admitting this evidence and allowing comment on it, the district court misled the jury and inflicted prejudice on Resnick. In the constitutional sense, the court violated a bedrock principle of our criminal justice system: courts cannot "impose[] … a penalty … for exercising a constitutional privilege" or "cut[] down on the privilege by making its assertion costly." *Griffin*, 380 U.S. at 614. To do so would recall "the inquisitorial system of criminal justice, … which the Fifth Amendment outlaws." *Id.* (quotation marks and citation omitted). Indeed, the *Griffin* court understood the power of the court's allowance of prosecutorial comment on a jury, and its words to that end are fitting: "What the jury may infer, given no help from the court, is one thing. What it may infer when the court solemnizes the silence of the accused into evidence against him is quite another." *Id.*

Second, in the evidentiary sense, the jury will be further emboldened by the court's tacit determination that a polygraph is both reliable and probative, and will be more likely to "abandon its duty to assess credibility and guilt." *Scheffer*, 523 U.S. at 314. "A fundamental premise of our criminal justice system is that the *jury* is the lie detector." *Id.* at 313 (quotation marks and citations omitted). When a court admits a refusal to

take a polygraph into evidence, it places its imprimatur on the reliability and relevance of polygraph findings. This impermissibly leads a jury into error.

Ultimately, the gravity of the district court's error necessitates a new trial; it seriously calls into question the fairness, integrity, and public reputation of the judicial proceedings. *See Olano*, 507 U.S. at 732. The government argues that even if it were plain error to admit the refusal evidence, it still presented "mounds of evidence" sufficient to convict Resnick. The majority agrees, calling the case against Resnick "airtight." This implies that only an innocent defendant could have his conviction reversed under plain error review. More disturbingly, it implies that a court may ignore a criminal defendant's clearly established rights if the evidence against him is strong enough.

This characterization is not a proper understanding of the fourth prong of *Olano* and thereby misinterprets plain error review. According to *Olano*, a "miscarriage of justice" that "seriously affects the fairness, integrity or public reputation of judicial proceedings" is not limited to cases where defendant is actually innocent. 507 U.S. at 736–37. In fact, the Supreme Court noted in *Olano* that "we have never held that" remand for plain error "is *only* warranted in cases of actual innocence." *Id.* This court has reaffirmed that a defendant need not "establish actual innocence" under *Olano* plain error review to trigger remand. *United States v. Driver*, 242 F. 3d 767, 771 (7th Cir. 2001). Resnick's guilt is not at issue on appeal; we only review whether he received a fair trial.

The majority opinion enumerates all of the things wrong with the polygraph evidence and discussion about it, but concludes that this is not a proper case for a *per se* rule; I find

it the perfect case for the use of such a rule. The crime charged is universally abhorred; the defendant is a wholly unsympathetic one. But if we are to accord *all* persons with their constitutional right to not be tried under rules that force them to testify against themselves, and to require the prosecutors and judges zealously ensure that criminal trials and evidence used in the trials are delivered fairly and completely constitutionally, this is the case to do so.

I admire the discussion of the problem by the majority; I disagree with the legal implication. The error was plain, damning, and cannot be overlooked. I would reverse for a new trial that would be conducted without any discussion of the refusal of Resnick to submit to a polygraph examination.