[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-10548

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

QUINEY HAROON PERDUE,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Alabama
D.C. Docket No. 2:21-cr-00051-ACA-JHE-1

_____

Before WILSON, LUCK, and TJOFLAT, Circuit Judges.

PER CURIAM:

On December 27, 2017, Quiney Haroon Perdue, aiding and abetting Mehvish Syed, a teller at a Wells Fargo Bank in Birmingham, Alabama, embezzled funds entrusted to the bank in the sum of $59,458. On February 24, 2021, Perdue and Syed were indicted in the Northern District of Alabama for conspiring to embezzle the bank's funds (Count One)[1] and embezzling the bank's funds (Count Two),[2] and Syed was charged with making false statements to the FBI on January 3, 2018, during its investigation of the case.[3]

Perdue was arrested on June 30, 2021.[4] On November 9, 2021, he pled guilty to Counts One and Two,[5] and on February 15, 2022, the District Court entered a final judgment sentencing him

---

[1] *See* 18 U.S.C. § 371. Conspiracy to commit offense or to defraud United States.

[2] *See id.* § 656.

[3] *See id.* § 1001. Statements or entries generally.

[4] Syed was arrested around the same time. She was arraigned on April 22, 2021, and admitted to bail. On June 1, 2022, she pled guilty to all three counts of the indictment. The District Court pronounced a 7-month prison sentence for each count to be served concurrently with each other at her sentencing hearing held on February 22, 2023, and entered judgment to that effect on March 8.

[5] Perdue pled guilty without a plea agreement.

to concurrent prison terms of 48 months.  The Court provided that the sentences would begin after Perdue completed (1) prison sentences totaling 303 months imposed in the Western District of Tennessee on September 4, 2019, for bank robberies attempted and executed in Memphis, Tennessee, on March 3 and 5, 2018, respectively; and (2) a concurrent sentence of 20 years imposed by the Circuit Court of Jefferson County, Alabama, for a robbery committed in Birmingham on April 25, 2017.

Perdue appeals the sentences imposed in the instant case, 48 months' imprisonment.  He seeks the vacation of his sentences and resentencing on two grounds.  First, he claims imprisonment for 48 months is procedurally unreasonable because the District Court failed to consider the "sentencing circumstances" of his conviction and sentencing in the Western District of Tennessee case.  Second, he argues his sentences are substantively unreasonable because the 48 months includes an unreasonable upward variance from the guideline sentence range of 24–30 months' imprisonment, and because the sentences are consecutive to the prison sentences he is presently serving.  We are unpersuaded and accordingly affirm.

## I.

Perdue contends that the District Court, in imposing a sentence above the guideline sentence range and then providing that it should run consecutively to the Western District sentence, failed to adequately consider the purposes of sentencing set out in 18

U.S.C. § 3553(a)[6] and, in particular, the record in the Western District of Tennessee case. The Court should have considered that record "[b]ecause the district court there was punishing [him] for his escalation in criminal conduct—a pattern which encompassed the offense conduct here, but reached its apogee in the Memphis Case." Appellant's Br. at 12. What that record shows is essentially what the Presentence Investigation Report ("PSR") before the District Court revealed.

The PSR details Perdue's personal history and behavior from the time he entered college in 2014 to the date of his sentencing in this case. In the Fall of 2014, Perdue entered the University of Alabama at Birmingham ("UAB") on a football scholarship. At some point during the Fall term, he was placed on academic probation. During the Spring term, he was expelled from his

---

[6] Section 3553(a) requires the court in imposing a prison sentence to consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
>> (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B) to afford adequate deterrence to criminal conduct;
>>
>> (C) to protect the public from further crimes of the defendant . . . .

18 U.S.C. § 3553(a)(1), (2)(A)–(C).

dormitory after failing a drug test.  UAB terminated its football program following the 2014–15 season.[7]

After UAB terminated its football program, Perdue transferred to the University of Kansas in Lawrence, Kansas, to participate in its football program.  He enrolled in the Summer 2015 term, performed satisfactorily, and then entered the Fall 2015 term.  Thereafter, things went downhill.  He was dropped from the football program for disciplinary reasons: he disobeyed his coaches, could not get along with his teammates, and quit going to class.

On December 1, 2015, Perdue was arrested after the police found marijuana in his student apartment bedroom at the university.  He was charged in the City of Lawrence Municipal Court with one count of possession of marijuana and one count of possession of drug paraphernalia, and on February 4, 2016, pled guilty to both offenses.  He was sentenced to a diversion program.

Perdue soon left Lawrence and returned to Birmingham.  He reentered UAB for the Spring 2016 term.  After completing that term, he enrolled in the Fall 2016 term but was placed on academic probation for that term.  He entered the Spring 2017 term but was suspended mid-term and evidently never returned to school.

---

[7] UAB has since reinstated its program.  Alex Scarborough, *UAB reinstates football for 2016*, ESPN (Jun. 1, 2015) https://www.espn.com/college-football/story/_/id/12991674/uab-blazers-football-return (last accessed Feb. 9, 2023).

Around that time, a former member of the UAB football team, "BH," introduced Perdue to his mother, "EL." After meeting EL, Perdue embarked on a crime spree, committing three robberies and attempting a fourth during a period of 11 months. The first occurred in Birmingham on April 25, 2017. He and EL devised a scheme whereby they purported to sell a car on Craigslist, an online site that allows users to list items for sale. They induced two individuals—a man and his mother-in-law—to go to a meeting site in Birmingham so the individuals could inspect the car Perdue and EL were purporting to sell. After the individuals, the victims, arrived in their own car, Perdue and another man ambushed them. They ordered the victims to get out of their car and give them their money. Then, they tazed the victims. One of the victims produced a pistol and shot Perdue once. Perdue and his accomplice took off running. Perdue went to the UAB hospital and was treated for life-threatening injuries. The police arrested Perdue on April 28, 2017, while he was in the hospital, and charged him with first degree robbery in two cases—one for each victim. On arraignment in the Circuit Court of Jefferson County, Alabama, on May 4, 2017, Perdue was released after posting surety bonds of $10,000 for each case.[8]

---

[8] There are two Alabama criminal dockets associated with this incident, reflecting one robbery case for each victim: Case No. CC-2018-000620 and CC-2018-000621. Bond was $10,000 for each case. First degree robbery is a class A felony under Ala. Code § 13A-8-41, and $10,000 is at the bottom of the recommended range for a class A felony under Alabama's bail schedule. *See* Ala. R. Crim. P. 7.2(b). Review of the state court records reveals his bond was reduced from an initial amount of $200,000 total ($100,000 for each case) to

22-10548                Opinion of the Court                7

On October 16, 2017, while he was out on bond, Perdue was arrested in Birmingham for several crimes, including: (1) theft of property in the third degree, which involved receiving stolen property—a Glock 23 .40 caliber pistol worth $549; (2) carrying a pistol without a permit—the Glock; (3) unlawful possession of marijuana, which the indictment indicated was in a quantity for other than personal use; and (4) unlawful possession of drug paraphernalia—a marijuana grinder.  Based on these arrests, the Jefferson County District Attorney moved the Circuit Court to revoke Perdue's bail and forfeit the bond he had posted following his arraignment on May 4, 2017.  The Court denied the motion, and Perdue remained free on bail.[9]

---

$20,000 total ($10,000 for each case) after he was kept in custody for longer than 72 hours without being taken before a judge.  *See* Ala. R. Crim. P. 4.3(b) (providing that a person arrested on a warrant issued upon a complaint who cannot obtain his release based on conditions provided on the warrant and has not been taken before a judge for an initial appearance within 72 hours "shall be released upon execution of an appearance bond in the minimum amount required by the schedule set forth in Rule 7.2(b)").  The docket sheet for CC-2018-000621 says he was released on May 14, but the state court records indicate he was released on May 4 for both cases.

[9] There are four Alabama criminal dockets associated with these arrests: Case No. CC-2018-000622 (receiving stolen property, third degree, a class D felony under Ala. Code § 13A-8-18.1), CC-2018-000623 (possession of marijuana for other than personal use, first degree, a class C felony under Ala. Code § 13A-12-213(a)(1)), CC-2018-000624 (carrying the pistol without a license, a misdemeanor), and CC-2018-000625 (possession of drug paraphernalia, a misdemeanor).  The bond amounts were set at, respectively: $5000, $2500, $300, and $300.  These amounts were at the bottom of the recommended range for each

After posting bond for the October 16, 2017 arrests, Perdue traveled to EL's Memphis, Tennessee residence. He stayed there until December 25, 2017, when he briefly returned to Birmingham with EL to commit the robbery in this case.

Perdue and EL returned to Birmingham because one of Perdue's former teammates on the UAB football team, "XM," called Perdue with a scheme to steal money from a Wells Fargo bank branch in Birmingham. XM told Perdue that his girlfriend, Mehvish Syed, was a teller at the bank, and that she could give him upwards of $100,000 in a staged robbery. Then, on December 25, 2017, Perdue and EL drove from Memphis to Birmingham to meet XM and work through the details of their scheme, including where to park during the robbery, when to conduct the robbery, and how to avoid surveillance cameras. XM told them about Syed and described her features.

The scheme went as follows. On December 27, Syed arranged to have an unusually large amount of money in her cash register for the staged robbery. Syed worked as a back-up commercial lane teller that day. Commercial lane tellers can keep greater amounts of cash in their registers than ordinary tellers can in order to service the bank's business customers. According to Syed's statement in a post-incident interview with the FBI on January 3,

---

charge under Alabama's bail schedule, except for the receiving stolen property offense, which had a recommended minimum bond amount of $1,000 as a class D felony. *See* Ala. R. Crim. P. 7.2(b).

2018, Wells Fargo's policy permitted commercial lane tellers to keep $25,000 in their registers, whereas ordinary tellers can only keep $6,000. She also did not clearly mark her lane as a commercial lane on the day of the robbery, which presumably helped ensure that business customers did not withdraw out of the additional cash in her register that she was planning to give Perdue.

That day, at approximately 12:42 P.M., Perdue entered the bank, approached Syed's window, and handed her a note purporting to threaten to kill her if she did not put the money from her register in his bag. The note read: "Run dat money bitch No dot packs No trackers all the damn money right now or you die." She asked him if it was a "change order," and he responded, "Yeah, this is a change order." A change order is the kind of large transaction that business customers make in the commercial lane. She gave him $59,458, essentially emptying her drawers except for small bills. She did not call for security and instead walked away from the lane quietly after Perdue left the bank. She also did not use other available security measures, like giving Perdue cash from her drawer that was equipped with security features.[10]   Another

---

[10] The Government stated during Perdue's change of plea hearing that a "dot pack and a bait pack" were available to Syed. A "bait pack" can refer to packages of cash that banks equip with security features, such as GPS trackers that are activated when the cash leaves the bank, see United States v. Warren, 593 F.3d 540, 542 (7th Cir. 2010), and "dye pack[s]" that explode when the money leaves the bank, marking the money with dye. See United States v. Santiago-González, 825 F.3d 41, 44 n.1 (1st Cir. 2016).

teller—"GV," whom Syed was training that day—pressed the silent security alarm after Perdue left the bank.  Syed had told GV that she was robbed after Perdue walked away from the counter.  Perdue left his note behind.

Following the bank robbery, Syed was interviewed at Birmingham police headquarters.  She claimed she was unable to identify the bank robber in a photographic lineup that included Perdue.  She admitted she had an unusual amount of cash in her drawer on the day of the robbery.  She claimed that she withdrew $30,000 from the bank's ATM because it was not working, and she wanted to keep more cash available for customers to withdraw while the ATM was down.  Yet video surveillance footage from the day of the robbery showed customers withdrawing cash from the ATM.  To explain why she kept all the extra cash in her own drawer, she said she was too busy to distribute the additional cash from the ATM to the other tellers.  Wells Fargo personnel advised investigators that Syed was in violation of company policy by holding far more money in her drawers than the company allowed for tellers.  Syed initially agreed to take a polygraph exam at the Birmingham Police Department on January 8, 2018, but she did not show.  The next time investigators reached out to her, she indicated she was represented by an attorney.

After the Wells Fargo bank robbery, Perdue returned with EL to Memphis.  There, he and EL split the money from the robbery and spent it on cars and gambling.  He did not give Syed or XM any of the money they conspired to steal from Wells Fargo

because she failed to make $100,000 available as originally discussed.

Meanwhile, four days after the incident, an anonymous tipster contacted Crime Stoppers of Metro Alabama in Birmingham and identified the Wells Fargo bank robbery suspect as Quiney Perdue. On February 6, 2018, a Birmingham latent print unit located and processed a latent print on the demand note Perdue left behind, which was identified as from the same source as the known left thumbprint of Quiney Perdue. A few days later, on February 21, "GM"—Perdue's former teammate and dormitory roommate at UAB for the Spring 2015 term, and an intern at the Birmingham Police Department at the time—identified him on security video from the Wells Fargo Bank.

Soon after returning to Memphis—and while evidently on the run for the bank robbery in this case—Perdue attempted two bank robberies in Memphis, completing the second. He first attempted to rob a First Tennessee Bank branch on March 3, 2018. During this attempted robbery, he threatened to shoot and kill everyone in the bank, including himself. Specifically, the note he gave the teller read: "Give me the money. Hit the button and I'm shooting you in the face! Nothing out of the first draw. No GPS.[11] If a

---

[11] Banks can embed GPS trackers in money to track robbers' locations after they leave the bank. *See United States v. Moore*, 572 F.3d 334, 336 (7th Cir. 2009) (discussing how a GPS embedded in stolen money helped police track down bank robbers). Perdue presumably referred to such a device in the note he gave Syed that read "no trackers."

dye pack[12] go off I got 17 shots. I'm killing everybody and myself." But he left the bank empty-handed after a teller activated the security alarm. Then, two days later, on March 5, he and an accomplice successfully robbed a First Tennessee Bank branch, taking nearly $30,000. Perdue shot the bank's security guard multiple times, and then he and the accomplice jumped over the counter and grabbed cash out of a teller drawer. The guard went to the hospital in critical condition and needed three surgeries to treat his wounds.

Perdue was apprehended at EL's residence on March 9, 2018, as a result of the investigation into the March 5 Memphis robbery and placed in the Memphis jail.[13] He was brought into federal custody for the Memphis bank robberies on March 20, 2018, on a writ issued by a federal magistrate judge. On March 15, 2019, without a plea agreement, Perdue pled guilty in the United States District Court for the Western District of Tennessee to two counts of bank robbery[14] and one count of the use, brandish, or discharge of

---

[12] "A security dye pack is a security device utilized by some banks to identify money stolen during a bank robbery. The security dye pack explodes and emits dye and pepper gas when removed from the bank." *United States v. Santiago-González*, 825 F.3d 41, 44 n.1 (1st Cir. 2016).

[13] He was arrested on March 9 as a Fugitive from Justice with Official Warrant from the state of Alabama. The warrant was for state charges for the Wells Fargo robbery involved in this case. The state bank robbery charges were dismissed on June 11, 2021, and the charge for being a fugitive from justice was dismissed on March 13, 2018.

[14] *See* 18 U.S.C. § 2113(a).

a firearm during a crime of violence.[15]  Perdue was sentenced to 303 months of imprisonment on September 4, 2019, for the Memphis offenses.  The sentence was affirmed on appeal on June 19, 2020.  *United States v. Perdue*, 818 F. App'x 419 (6th Cir. 2020).

Meanwhile, on April 29, 2019, federal investigators interviewed Perdue in Memphis.  In addition to any discussion of the Memphis case, he discussed the Craigslist robbery and the robbery in this case.

On October 17, 2019, while he was in federal custody on the sentences imposed in the Memphis case, arrest warrants were served on Perdue for the charges pending against him in the Circuit Court of Jefferson Country; *i.e.*, the April 25, 2017 first degree robberies he committed in Birmingham, and the offenses he was arrested for in Birmingham on October 16, 2017, while free on bail (*see* supra note 9).  Perdue pled guilty in the Circuit Court to the first degree robberies on May 13, 2021, and the Court sentenced him to 20 years in prison, the sentences to run concurrently with the 303-month federal sentence he received for the Memphis bank robberies.  Effectively, this sentence did not add any prison time for Perdue.  The State dismissed the charges relating to the arrests on October 16, 2017, on May 20, 2021.

Perdue was sentenced for the instant offenses after he was sentenced in the Western District of Tennessee and Jefferson

---

[15] *See* 18 U.S.C. § 924(c).

County.  The PSR calculated Perdue's criminal history score as 8 and his criminal history category as IV based on his prior convictions.  Given a total offense level of 13 and a criminal history of IV, the PSR called for a sentence of imprisonment ranging from 24–30 months.  At the time of his sentencing, Perdue was serving a 303-month sentence for the Memphis robberies and the 20-year sentence for the Birmingham robberies.

In its sentencing memorandum, the Government argued that Perdue's criminal history, the need to promote respect for the law, and the need for specific deterrence warranted concurrent 60-month prison sentences, and that the District Court should run the sentences consecutively to the prison sentences he was serving.  In his sentencing memorandum, Perdue did not object to the PSR's findings of fact.  He argued that he should receive 30-month concurrent sentences to run concurrently with the sentences he was serving because of mitigating circumstances related to his personal history and characteristics.  He also argued that the sentences for the Memphis robberies were long enough to punish him adequately, so the Court did not need to impose consecutive sentences in this case.

At the sentencing hearing, the Government reiterated its argument for consecutive sentences totaling 60 months, and Perdue reiterated his argument for concurrent sentences totaling 30 months.  The District Court adopted the factual findings in the PSR, heard argument from both sides, and heard Perdue's allocution.

The District Court then imposed a 48-month prison sentence for each of the two counts in the indictment to run concurrently with each other. The Court explained that the guideline sentence range was insufficient given the progressively violent nature of Perdue's conduct, the need for specific deterrence, and the need to promote respect for the law. The Court also ran the sentences consecutively to Perdue's sentences in the federal bank robbery case in Memphis and the robbery case in Birmingham.

After imposing the sentence, the District Court elicited the parties' objections in accordance with Eleventh Circuit precedent. *See United States v. Jones*, 899 F.2d 1097, 1102 (11th Cir. 1990), *overruled on other grounds by United States v. Morrill*, 984 F.2d 1136, 1137 (11th Cir. 1993) (en banc). Neither party objected. Perdue now appeals, arguing that the sentences are procedurally unreasonable because the District Court did not consider the sentencing record in the Memphis case when it based its sentences in part on Perdue's conduct in that case, and that the sentences are substantively unreasonable because they are above the guideline sentence range and imposed to run consecutively to his undischarged terms of imprisonment in the other cases.

## II.

An appellate court reviews a sentence for an abuse of discretion, "[r]egardless of whether the sentence imposed is inside or outside the Guidelines range." *Gall v. United States*, 552 U.S. 38, 51, 128 S. Ct. 586, 597 (2007). An abuse of discretion occurs if in deciding an issue "the district court applies an incorrect legal standard or

makes findings of fact that are clearly erroneous." *United States v. Wilk*, 572 F.3d 1229, 1234 (11th Cir. 2009). Procedural sentencing errors include failing to correctly calculate the guideline range, treating the guidelines as mandatory, failing to consider the 18 U.S.C. § 3553(a) factors, selecting the sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence, including any deviation from the guideline range.

Plain error review applies to procedural sentencing challenges on appeal when the defendant failed to object to the claimed error before the district court. *United States v. Vandergrift*, 754 F.3d 1303, 1307 (11th Cir. 2014). "To preserve an issue for appeal, one must raise an objection that is sufficient to apprise the trial court and the opposing party of the particular grounds upon which appellate relief will later be sought." *United States v. Straub*, 508 F.3d 1003, 1011 (11th Cir. 2007) (internal quotation marks omitted). Plain error review applies to Perdue's procedural reasonableness claim because he did not specifically object to the District Court's reliance on his criminal history without considering the sentencing circumstances in the case involving the Memphis robberies.

Under plain error review, Perdue cannot prevail unless he shows: (1) an error occurred, (2) the error was plain, (3) the error affected his substantial rights, and (4) the error seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Vandergrift*, 754 F.3d at 1307. "When the explicit language of a statute or rule does not specifically resolve an issue, there can be no plain error where there is no precedent from the Supreme Court

or this Court directly resolving it." *United States v. Castro*, 455 F.3d 1249, 1253 (11th Cir. 2006) (internal quotation marks omitted).

Section 3584(a) of Title 18 of the U.S. Code states that, "[i]f multiple terms of imprisonment are imposed on a defendant at the same time, or if a term of imprisonment is imposed on a defendant who is already subject to an undischarged term of imprisonment, the terms may run concurrently or consecutively." 18 U.S.C. § 3584(a). In determining whether the terms imposed are to run concurrently or consecutively, the court must consider the § 3553(a) factors. 18 U.S.C. § 3584(b).

Here, the District Court did not make a plain procedural error. Perdue does not cite, and we have not found, a Supreme Court or Eleventh Circuit case that explicitly requires a district court to consider, on the record, the "sentencing circumstances" in the cases involving prior convictions when it considers a defendant's criminal history. Section 3553(a)(1), which covers "the nature and circumstances of the offense and the history and characteristics of the defendant," also does not explicitly require a district court to consider sentencing circumstances from prior cases on the record in considering the history and characteristics of the defendant. Section 3553(a)(2) lacks any explicit requirement to that effect as well.

### III.

When reviewing a sentence for substantive reasonableness, we consider the totality of the circumstances under a deferential abuse-of-discretion standard. *Gall*, 552 U.S. at 51, 128 S. Ct. at 597.

A court imposes a substantively unreasonable sentence only when it (1) fails to adequately consider relevant factors that were due significant weight, (2) gives significant weight to an improper or irrelevant factor, or (3) commits a clear error of judgment in considering the proper factors. *United States v. Rosales-Bruno*, 789 F.3d 1249, 1256 (11th Cir. 2015). In determining whether to impose a variance, a district court may consider the nature of a prior offense under the § 3553(a) factors, even if the offense was considered in calculating the defendant's criminal history score under the guidelines. *United States v. Williams*, 526 F.3d 1312, 1324 (11th Cir. 2008).

Here, Perdue's sentence was substantively reasonable. The District Court committed no clear error in judgment by determining that Perdue's criminal history, the need to promote respect for the law, and the need for specific deterrence required an 18-month upward variance (from the guideline sentence range) and consecutive, rather than concurrent, sentences.

AFFIRMED.